UNITED STATES of America, Appellee,

v.

Vincent GIGANTE, also known as "Chin," Defendant–Appellant.

Docket No. 98–1001.

United States Court of Appeals, Second Circuit.

Argued Oct. 20, 1998.

Decided Jan. 22, 1999.

Andrew Weissmann and Daniel Dorsky, Assistant United States Attorneys (Zachary W. Carter, United States Attorney, and David C. James and George A. Stamboulidis, Assistant United States Attorneys, E.D.N.Y., Brooklyn, N.Y., of counsel), for Appellee.

Steven R. Kartagener, New York, N.Y. (Michael A. Marinaccio, Culleton, Marinaccio & Foglia, White Plains, N.Y., on the brief), for Defendant–Appellant.

Before: OAKES and WALKER, Circuit Judges, and KNAPP, District Judge.*

JOHN M. WALKER, JR., Circuit Judge:

Defendant-appellant Vincent Gigante appeals from a judgment of conviction entered December 18, 1997, after a jury trial in the United States District Court for the Eastern District of New York (Jack B. Weinstein, *Judge*), convicting Gigante of racketeering in violation of the RICO statute, 18 U.S.C. § 1962(c); RICO conspiracy in violation of 18 U.S.C. § 1962(d); conspiracy to murder in violation of 18 U.S.C. § 1959(a)(5); an extortion conspiracy in violation of 18 U.S.C. § 1951; and a labor payoff conspiracy in violation of 18 U.S.C. § 371.

Gigante raises three challenges to his conviction. First, he contends that the district court violated his confrontation rights under the Sixth Amendment by allowing a govern-ment witness to testify via two-way closed-circuit television from a remote location. Second, he argues that the trial court improperly allowed testimony under the co-conspirator exception to the hearsay defini-tion. Finally, Gigante argues that the district court erred in finding that he was competent to stand trial. For the reasons set forth below, we reject each of Gigante's arguments and affirm his conviction.

## BACKGROUND

This case arises from the government's continuing efforts to thwart the criminal activity of La Cosa Nostra, also known as the Mafia. The New York Mafia is comprised of five organized crime families: the Bonnano, Colombo, Gambino, Lucchese and Genovese families, each spearheaded by a boss. *See United States v. Orena*, 32 F.3d 704, 708 (2d Cir.1994). The government asserted that Vincent Gigante was the boss of the Genovese family and supervised its criminal activity.

Gigante was charged with two major categories of crimes: murder and labor racketeering. The government alleged that Gigante was the ultimate authority behind the murders of many fellow members of the Mafia, which were generally intended to enforce the rules of the organization or to prevent cooperation with the authorities. The government also charged Gigante with conspiring to use extortion and kickbacks to effect the criminal infiltration of the window replacement industry in and around New York City. He followed a long line of other organized crime figures whom the government had already convicted for their participation in this "Windows" scheme. *See, e.g., United States v. Amuso*, 21 F.3d 1251, 1254 (2d Cir.1994) (describing progression of Windows prosecutions).

The government presented its case against Gigante in large part through the testimony of six former members of the Mafia who had become cooperating witnesses: Alphonso D'Arco, once the acting boss of the Lucchese

---

* The Honorable Whitman Knapp, of the United States District Court for the Southern District of New York, sitting by designation.

family; Salvatore Gravano, the former Gambino family underboss; Peter Chiodo, who was a Lucchese captain; Phillip Leonetti and Gino Milano, past members of La Cosa Nostra in Philadelphia; and Peter Savino, a former associate of the Genovese family. The government also introduced a wealth of tapes recorded over many years of surveillance of Gigante and other Mafia figures, and supported this evidence with the testimony of law enforcement officers.

The cooperating witnesses testified at length about the structure and rules of La Cosa Nostra, described Gigante's place in the Mafia hierarchy, and detailed his efforts to hide his complicity through continuous public demonstrations of mental instability. The tapes and witnesses revealed Gigante's complicity in planning and approving murders within the Mafia and in assisting in the direction of the Windows extortion scheme.

The jury acquitted Gigante or failed to reach a verdict on all charges surrounding the murders of Jerry Pappa, Anthony Capongiro, Fred Salerno, John "Keys" Simone, Frank Sindone, Frank "Chickie" Narducci, Rocco "Rocky" Marinucci, and Enrico "Eddie" Carini. The jury found Gigante guilty of the more recent conspiracies to murder Peter Savino and John Gotti, although the court later dismissed the charge of conspiracy to murder Gotti as time-barred. *See United States v. Gigante*, 982 F.Supp. 140, 159 (E.D.N.Y.1997). Gigante was also convicted on all the extortion and labor payoff counts related to the Windows scheme. *See id.* at 177–81 (reprinting completed jury verdict sheet). Gigante was sentenced to twelve years in prison, five years of supervised release, and a fine of $1,250,000. This appeal followed.

## DISCUSSION

I. *The Use of Two–Way Closed–Circuit Television Testimony*

█ Gigante argues that the admission of Peter Savino's testimony via two-way, closed-circuit television testimony from a remote location violated his Sixth Amendment right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Gigante maintains that no compelling government interest justified the deprivation of his constitutional right to a face-to-face confrontation with Savino.

Preliminarily, we note the government's argument that Gigante waived his right to confront Savino. The government asserts that by refusing to attend a deposition of Savino pursuant to Rule 15, Fed.R.Crim.P., Gigante waived his right to a face-to-face confrontation. More fundamentally, the government argues that Gigante waived his confrontation rights through his own misconduct, with protracted attempts to delay his own trial by feigning incompetence. We need not resolve these questions relating to possible waiver, however, because Gigante's claim fails on the merits: under the circumstances of this case, the procedures by which Savino testified did not violate Gigante's confrontation rights.

Peter Savino, a former associate of the Genovese crime family, was a crucial witness against Gigante, providing direct testimony of his involvement in the Windows scheme. As a cooperator with the government since 1987, Savino was a participant in the Federal Witness Protection Program. At the time of Gigante's trial in 1997, Savino was in the final stages of an inoperable, fatal cancer, and was under medical supervision at an undisclosed location.

The government made an application for an order allowing Savino to testify via closed-circuit television due to his illness and concomitant infirmity. Judge Weinstein held a hearing to determine whether Savino was able to travel to New York to testify at Gigante's trial. At this hearing, an emergency medicine physician employed by the Federal Witness Protection Program testified that he had examined Savino and that "it would be medically unsafe for [Savino] to travel to New York for testimony." Defense counsel cross-examined the government physician and then presented an oncologist of their own who testified that "it would not be life-threatening" for Savino to travel to New York.

█ Judge Weinstein held in a published opinion that "[m]edical reports and testimony

for the government and defendant fully supported the government's contention, by clear and convincing proof, that the witness could not appear in court." *United States v. Gigante,* 971 F.Supp. 755, 756 (E.D.N.Y.1997). Although Gigante attacks this determination, we review this factual finding for clear error. Judge Weinstein's holding was supported by evidence in the record and was not clearly erroneous.

Because of Savino's illness, Judge Weinstein permitted him to testify via two-way, closed-circuit television, basing his decision upon his "inherent power" under Fed. R.Crim.P. 2 and 57(b) to structure a criminal trial in a just manner. *Gigante,* 971 F.Supp. at 758–59. During his testimony, Savino was visible on video screens in the courtroom to the jury, defense counsel, Judge Weinstein and Gigante. Savino could see and hear defense counsel and other courtroom participants on a video screen at his remote location.

Gigante's argument that this procedure deprived him of his right to confront Savino amounts to the argument that his Sixth Amendment right could only be preserved by a face-to-face confrontation with Savino *in the same room.* We disagree. While the use of remote, closed-circuit television testimony must be carefully circumscribed, Judge Weinstein's order in this case adequately protected Gigante's confrontation rights.

■ The Supreme Court has declared that "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Coy v. Iowa,* 487 U.S. 1012, 1016, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). In *Coy,* the Court reversed the defendant's conviction for sexual assault after a 13–year–old alleged victim was permitted to testify out of sight of the

defendant. *See id.* at 1022, 108 S.Ct. 2798. However, the right to face-to-face confrontation is not absolute; in *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), the Court held that one-way closed-circuit television testimony by a child witness in an abuse case may be permissible upon a case-specific finding of necessity. *See id.* at 857, 110 S.Ct. 3157.

The Supreme Court explained that "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Id.* at 845, 110 S.Ct. 3157. The salutary effects of face-to-face confrontation include 1) the giving of testimony under oath; 2) the opportunity for cross-examination; 3) the ability of the fact-finder to observe demeanor evidence; and 4) the reduced risk that a witness will wrongfully implicate an innocent defendant when testifying in his presence. *See id.* at 845–46, 110 S.Ct. 3157.

■ The closed-circuit television procedure utilized for Savino's testimony preserved all of these characteristics of in-court testimony: Savino was sworn; he was subject to full cross-examination; he testified in full view of the jury, court, and defense counsel; and Savino gave this testimony under the eye of Gigante himself.[1] Gigante forfeited none of the constitutional protections of confrontation.

In *Craig,* the Supreme Court indicated that confrontation rights "may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Craig,* 497 U.S. at 850, 110 S.Ct. 3157. Gigante

---

1. There is some dispute over whether Savino could see Gigante himself in the background of his monitor. However, it is clear that Judge Weinstein afforded defense counsel the opportunity to place Gigante's televised visage squarely before Savino (Mr. Culleton was to cross-examine Savino):

> THE COURT: Is this where you wish the camera—
> MR. CULLETON: Exactly. He can look at me and I'll be looking at him.

> THE COURT: You don't want him to look at the defendant?
> MR. CULLETON: Not necessary.
> THE COURT: And you don't want the defendant to look directly eye to eye?
> MR. CULLETON: We don't need it. Absolutely not, Judge.

Gigante, having explicitly declined the option of being viewed by Savino, has waived any claim of error based on that deprivation.

seeks to hold the government to this standard, and challenges the government to articulate the important public policy that was furthered by Savino's testimony. However, the Supreme Court crafted this standard to constrain the use of one-way closed-circuit television, whereby the witness could not possibly view the defendant. Because Judge Weinstein employed a two-way system that preserved the face-to-face confrontation celebrated by *Coy*, it is not necessary to enforce the *Craig* standard in this case.

A more profitable comparison can be made to the Rule 15 deposition, which under the Federal Rules may be employed "[w]henever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial." Fed. R.Crim.P. 15(a). That testimony may then be used at trial "as substantive evidence if the witness is unavailable." Fed.R.Crim.P. 15(e). Unavailability is defined by reference to Rule 804(a) of the Federal Rules of Evidence, which includes situations in which a witness "is unable to be present or to testify at the hearing because of ... physical or mental illness or infirmity." Fed.R.Evid. 804(a)(4).

 The decision to permit a deposition under Rule 15 "rests within the sound discretion of the trial court, and will not be disturbed absent clear abuse of discretion." *United States v. Johnpoll,* 739 F.2d 702, 708 (2d Cir.1984) (internal citations omitted). "It is well-settled that the 'exceptional circumstances' required to justify the deposition of a prospective witness are present if that witness's testimony is material to the case and if the witness is unavailable to appear at trial." *Id.* at 709. Under the circumstances of this case, Judge Weinstein could have admitted Savino's testimony pursuant to Rule 15 without offending the confrontation clause. *See United States v. Salim,* 855 F.2d 944, 954–55 (2d Cir.1988); *Johnpoll,* 739 F.2d at 710.

Judge Weinstein considered the utility of a Rule 15 deposition for preserving Savino's testimony, and noted that the government was "able to make the threshold showing entitling it to a [Rule 15] deposition." *Gigante,* 971 F.Supp. at 758. Had Judge Weinstein allowed a deposition, this would not have been an abuse of discretion, given the medical evidence of Savino's poor health. However, due to the joint exigencies of Savino's secret location and Gigante's *own* ill health and inability to travel, Judge Weinstein concluded that "deposing the witness is not appropriate," and that "contemporaneous testimony via closed circuit televising affords greater protection of [Gigante's] confrontation rights than would a deposition." *Id.* at 758–59.

We agree that the closed-circuit presentation of Savino's testimony afforded greater protection of Gigante's confrontation rights than would have been provided by a Rule 15 deposition. It forced Savino to testify before the jury, and allowed them to judge his credibility through his demeanor and comportment; under Rule 15 practice, the bare transcript of Savino's deposition could have been admitted, which would have precluded any visual assessment of his demeanor. Closed-circuit testimony also allowed Gigante's attorney to weigh the impact of Savino's direct testimony on the jury as he crafted a cross-examination.

 Closed-circuit television should not be considered a commonplace substitute for in-court testimony by a witness. There may well be intangible elements of the ordeal of testifying in a courtroom that are reduced or even eliminated by remote testimony. However, two-way closed-circuit television testimony does not necessarily violate the Sixth Amendment. Because this procedure may provide at least as great protection of confrontation rights as Rule 15, we decline to adopt a stricter standard for its use than the standard articulated by Rule 15. Upon a finding of exceptional circumstances, such as were found in this case, a trial court may allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice.

The facts of Savino's fatal illness and participation in the Federal Witness Protection Program, coupled with Gigante's own inability to participate in a distant deposition, satisfy this exceptional circumstances require-

ment, and Judge Weinstein did not abuse his discretion by allowing Savino to testify in this manner. Savino's testimony did not deprive Gigante of his right to confront his accuser under the Sixth Amendment.

## II. *The Admission of Coconspirator Testimony*

▮ Gigante contends that Judge Weinstein admitted substantial prejudicial testimony by misconstruing the proper scope of Fed.R.Evid. 801(d)(2)(E), which provides that "a statement is not hearsay if . . . [it] is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Gigante argues that these evidentiary rulings constituted reversible error.

▮ To admit a statement under the coconspirator exception to the hearsay definition, a district court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy. *See Orena*, 32 F.3d at 711; *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir.1990) (citing *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)). We will not disturb a district court's findings on these issues unless they are clearly erroneous. Moreover, any improper admission of coconspirator testimony is subject to harmless error analysis. *See Orena*, 32 F.3d at 711.

▮ The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment. *See id.* at 713. In addition, while the hearsay statement itself may be considered in establishing the existence of the conspiracy, "there must be some independent corroborating evidence of the defendant's participation in the conspiracy." *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir.1996); *see also* Fed.R.Evid. 801(d)(2). The identities of both the declarant and the witness who heard the hearsay evidence, however, are non-hearsay evidence that may be considered in assessing the reliability of the statement and finding the existence of a conspiracy. *See Tellier*, 83 F.3d at 580 n. 2; Fed.R.Evid. 801(d)(2) advisory committee's note to 1997 Amendment.

▮ As to the second requirement, statements made during the course and in furtherance of a conspiracy "must be such as to prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity." *Maldonado-Rivera*, 922 F.2d at 958. This can include those statements "that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." *Id.* at 959. In addition, while idle chatter among conspirators does not satisfy the "in furtherance" requirement of Rule 801(d)(2)(E), often these statements are admissible as declarations against penal interest or under the state of mind hearsay exception. *See United States v. Paone*, 782 F.2d 386, 390–91 (2d Cir.1986).

▮ A conspiracy may involve only two or three individuals. In the context of a RICO prosecution of organized criminals, however, the relevant conspiracy may grow quite large. For example, the Windows conspiracy, of which Gigante was a part, was a sprawling criminal enterprise involving both the Genovese and Colombo crime families and enveloping an entire industry. *See United States v. Gigante*, 39 F.3d 42, 44 (2d Cir.1994) (describing Windows scheme). The conspiratorial ingenuity of La Cosa Nostra expands the normal boundaries of a criminal enterprise, and Rule 801(d)(2)(E) must expand accordingly to encompass the full extent of the conspiracy.

▮ However, even in the context of organized crime, there is a limit to the proper use of Rule 801(d)(2)(E) to admit coconspirator testimony. The district court in each instance must find the existence of a specific criminal conspiracy beyond the general existence of the Mafia. And when a RICO conspiracy is charged, the defendant must be linked to an individual predicate act by more than hearsay alone before a statement related to that act is admissible against

the defendant under Rule 801(d)(2)(E). *See Tellier*, 83 F.3d at 581.

Early in Gigante's trial, Judge Weinstein announced his finding that "there is a general overriding conspiracy among all of these alleged Mafia groups." He then admitted some evidence under Rule 801(d)(2)(E) based solely on this finding of a general conspiracy. This was error. The district court's rationale would allow the admission of any statement by any member of the Mafia regarding any criminal behavior of any other member of the Mafia. This is not to say that there can never be a conspiracy comprising many different Mafia families; however, it must be a conspiracy with some specific criminal goal in addition to a general conspiracy to be members of the Mafia. It is the unity of interests stemming from a specific shared criminal task that justifies Rule 801(d)(2)(E) in the first place—organized crime membership alone does not suffice.

Although we find that Judge Weinstein construed Rule 801(d)(2)(E) too broadly, many of the statements contested by Gigante were properly admitted. For example, Gigante contends that it was error to admit Alphonse D'Arco's testimony that Jimmy Ida (of the Genovese Family) told D'Arco that Gigante wanted him to help locate and murder Savino in Hawaii. Similarly, Gigante contests the district court's admission of D'Arco's testimony that Vittorio Amuso (his boss in the Lucchese family) told D'Arco that Gigante was aware of and approved of the plot to murder John Gotti. Gigante argues that there was no independent corroborating evidence of his involvement in a conspiracy to murder either Savino or Gotti. However, there was substantial corroborating evidence that could support findings by Judge Weinstein that Gigante was boss of the Genovese family, that the Genovese family was involved in the conspiracies to murder Savino and Gotti, and that Gigante, as boss, was necessarily involved in these conspiracies. The admission of these statements was not clearly erroneous.

 On other occasions, the district court erred in admitting evidence under Rule 801(d)(2)(E). Gigante argues that Judge Weinstein improperly admitted a tape re-cording of Gotti, Gravano and John D'Amato (street boss of a New Jersey family) discussing a conspiracy to murder Corky Vastola, and stating that they needed to secure Gigante's permission to utilize a particular person to kill Vastola. The evidence indicated that Gigante refused this permission. The discussions between Gotti, Gravano and D'Amato should have been excluded, because there was no evidence that Gigante ever joined in a conspiracy with those figures to murder Vastola. The government argues that these discussions reveal Gigante's role in a general process and network of criminal conspiracy and activity. However, these discussions were not "in furtherance of" a specific criminal purpose, and the fact that Gigante might have conspired with Gotti and Gravano to commit other crimes on other occasions is irrelevant.

Nonetheless, to the extent that these or any other statements were erroneously admitted under Rule 801(d)(2)(E), they did not "effect actual prejudice resulting in 'substantial and injurious effect or influence in determining the jury's verdict.'" *Ayala v. Leonardo*, 20 F.3d 83, 92 (2d Cir.1994) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). Several admitted statements would have been properly admissible either as declarations against penal interest or under the state of mind exception to the hearsay rule. The jury acquitted Gigante on some of the charges against him, convicted him on other charges, and were unable to reach a verdict on still other allegations. This demonstrates that the jury was able to distinguish among the charges against Gigante and weigh the evidence on each separate count. There was substantial direct and circumstantial evidence connecting Gigante to each of the crimes for which he was convicted. Having considered all of Gigante's evidentiary arguments, we hold that any errors by the district court were harmless.

### III. *Competency to Stand Trial*

 Gigante also challenges the trial court's determination that he was competent to stand trial. We uphold a district court's finding of competence unless that finding is

clearly erroneous. *See United States v. Morrison,* 153 F.3d 34, 46 (2d Cir.1998). Under this highly deferential standard, " '[w]here there are two permissible views of the evidence as to competency, the court's choice between them cannot be deemed clearly erroneous.' " *United States v. Nichols,* 56 F.3d 403, 411 (2d Cir.1995) (quoting *United States v. Villegas,* 899 F.2d 1324, 1341 (2d Cir. 1990)).

 Judge Weinstein was not the first judge to make a finding regarding Gigante's competency. Gigante's trial had been previously assigned to Judge Eugene Nickerson, who conducted the first hearings to determine whether Gigante was competent to stand trial. Four separate psychiatrists testified that Gigante was incompetent, although reservations were expressed that he might be malingering. *See United States v. Gigante,* 925 F.Supp. 967, 968 (E.D.N.Y.1996).

Judge Nickerson then received testimony from former members of the Mafia (many of whom later testified at Gigante's trial), and made the factual findings that "Gigante was a forceful and active leader of the Genovese family from at least 1970 on" and that Gigante had put on a "crazy act" for many years in order "to avoid apprehension by law enforcement." *Id.* at 976. After being presented with these findings, two of the examining psychiatrists changed their opinion, indicating that they now thought Gigante was malingering; one said Gigante was competent to stand trial, and the other said it was quite possible that Gigante was competent. The remaining psychiatrists held to their earlier findings of incompetence. *See United States v. Gigante,* 987 F.Supp. 143, 146 (E.D.N.Y.1996). Judge Nickerson found "the weight of medical opinion to show that Gigante is mentally competent to stand trial." *Id.* at 147.

When Gigante renewed his claim of incompetence due to Alzheimer's disease, Judge Nickerson recused himself, and the case was reassigned to Judge Weinstein. *See Gigante,* 982 F.Supp. at 146. Gigante presented new evidence of incompetence in the form of a Positron Emission Tomography (PET) scan of Gigante's brain and the results of a battery of tests designed to identify malin-

gering. The defense experts who presented this evidence testified that Gigante was incompetent to be tried. The government then presented a witness who testified that it was possible that the results of these tests were due to the drugs Gigante was receiving. *See id.* at 147. Judge Weinstein held that Gigante was competent and ordered that the trial proceed. *See id.* at 148.

Judge Nickerson and Judge Weinstein, after conducting separate hearings, reached the identical conclusion that Gigante was malingering, and that he was competent to stand trial. This was a permissible conclusion in light of the expert testimony and extensive evidence of Gigante's attempts to elude prosecution, and we do not find it to be clearly erroneous.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.