IN THE MISSOURI COURT OF APPEALS
 WESTERN DISTRICT
 IN THE INTEREST OF: C.A.R.A., )
 Appellant, )
 )
 v. ) WD83967
 )
 JACKSON COUNTY JUVENILE ) FILED: July 6, 2021
 OFFICE, )
 Respondent. )
 Appeal from the Circuit Court of Jackson County
 The Honorable Jalilah Otto, Judge
 Before Division Two: Mark D. Pfeiffer, P.J.,
 and Alok Ahuja and Karen King Mitchell, JJ.
 The Circuit Court of Jackson County entered a judgment finding that

C.A.R.A., a juvenile, committed acts which would constitute first-degree statutory

sodomy if committed by an adult. The court ordered C.A.R.A. to be committed to

the custody of the Director of Family Court Services for residential placement.
C.A.R.A. appeals. He argues that the evidence was insufficient to prove that he

committed acts constituting first-degree statutory sodomy. C.A.R.A. also argues

that the circuit court violated his right to confront adverse witnesses when it

permitted the Juvenile Officer’s witnesses to testify by two-way videoconferencing

technology, due to the risks posed by the ongoing COVID-19 pandemic.

 We conclude that C.A.R.A.’s sufficiency-of-the-evidence argument lacks merit.

We also conclude, however, that the circuit court violated C.A.R.A.’s right to

confrontation under the United States and Missouri Constitutions when it allowed
the Juvenile Officer’s witnesses to testify remotely, without making a finding that
this was necessary or justified by exceptional circumstances. Given that conclusion,

we would normally reverse the circuit court’s judgment, and remand for further

proceedings. Because of the general interest and importance of the Confrontation

Clause issue, however, we do not finally decide C.A.R.A.’s appeal, but instead order

that this appeal be transferred to the Missouri Supreme Court for final disposition.

 Factual Background
 On November 1, 2019, the Jackson County Juvenile Officer filed a first

amended petition in the circuit court, alleging that C.A.R.A. committed acts which

would constitute first-degree statutory sodomy under § 566.0621 if committed by an

adult. The Juvenile Officer alleged that, on April 30, 2019, C.A.R.A. had deviate

sexual intercourse with the Victim by inserting his finger into Victim’s vagina. At

the time of the alleged offense, C.A.R.A. was one month short of his thirteenth

birthday; the Victim was five years old. The offense allegedly occurred while Victim

was at the home of a babysitter. (The first amended petition also alleged additional

offenses which are not at issue in this appeal.)

 On June 1, 2020, prior to the adjudication hearing, C.A.R.A. filed an

“Objection to Virtual Adjudication, and Request to Appear in Person.” C.A.R.A.

objected to an adjudication by videoconference technology and argued that he had

constitutional and statutory rights to physically confront adverse witnesses. The

Juvenile Officer filed a response, arguing that in light of the on-going COVID-19

pandemic, and consistent with orders issued by the Missouri Supreme Court2 and

the Presiding Judge of the Sixteenth Judicial Circuit,3 the court should hold

C.A.R.A.’s adjudication hearing using videoconferencing technology.

 1 Statutory citations refer to the 2016 edition of the Revised Statutes of
Missouri.
 2 In re: Operational Directives for Easing COVID-19 Restrictions on In-Person
Proceedings (May 4, 2020).
 3 Administrative Order 2020-084 (May 14, 2020).

 2
 On June 19, 2020, the circuit court held C.A.R.A.’s adjudication hearing using

a “hybrid” format. The judge, the judge’s staff, C.A.R.A., and C.A.R.A.’s attorney

were all present in the courtroom in person. The Victim, Victim’s mother, and a

third-party witness for the Juvenile Officer provided testimony remotely by means

of the Cisco Webex videoconferencing software. The attorneys for the Juvenile

Officer, a Deputy Juvenile Officer, C.A.R.A.’s mother and grandparents (and their

attorneys), a representative of Victim Services, and Victim’s father all attended the

adjudication hearing remotely using the videoconferencing software.

 At the start of the adjudication hearing, C.A.R.A. repeated his objection to

the Juvenile Officer’s witnesses testifying remotely, and argued that such remote

testimony violated his rights to due process, to equal protection, and to confront the

witnesses against him. The family court overruled C.A.R.A.’s objection:

 [I]n reviewing the Supreme Court order and [the Presiding Judge’s]
 order that were put in place in response to the COVID-19 pandemic
 that has affected the entire world, the Supreme Court has permitted
 the use of Webex in all types of hearings at this time in the State of
 Missouri.
 So we have a hybrid here. Just for the record, the setup is such
 that I am in the courtroom with my staff. Mr. Stokely [(C.A.R.A.’s
 counsel)] is here. [C.A.R.A.] is here. The placement providers
 [C.A.R.A.’s grandparents] are here in the courtroom on Webex camera.
 The juvenile officer, as well as the witnesses that are going to be called
 today, are also on the Webex. Counsel for the placement providers are
 on the Webex. As well as [C.A.R.A.’s] mother is on the Webex and
 counsel for mother is also on the Webex.
 . . . There also is a camera pointed to the gallery or the well of
 the courtroom so everyone on the Webex can not only see me, but they
 can also see the courtroom, including [C.A.R.A.] and Mr. Stokely.
 And there’s a large . . . chalkboard-sized projection on the wall of
 what’s going on with the Webex. So Mr. Stokely and [C.A.R.A.] can see
 who is on the Webex call and who is talking at any given time. So
 everyone can see everyone basically in realtime.
 . . . And with that being said . . . I will order that we are going
 forward at this time in this manner.

 3
 In addition to testimony from Victim, Victim’s mother, and Victim’s

babysitter, the court admitted into evidence, over C.A.R.A.’s objection, a video

recording of Victim’s forensic interview, a summary of that interview, and a

marked-up anatomical drawing used during the interview. C.A.R.A. did not put on

any evidence.

 The circuit court sustained the allegation of first-degree statutory sodomy

beyond a reasonable doubt. The court also sustained the remaining allegations in

the first amended petition, which C.A.R.A. had admitted. Following a dispositional

hearing, the court ordered that C.A.R.A. be committed to the custody of the Director

of Family Court Services for residential placement.

 C.A.R.A appeals.

 Discussion
 C.A.R.A. raises three Points on appeal. In his first Point, C.A.R.A. challenges

the sufficiency of the evidence to support a finding that he committed acts which

would constitute first-degree statutory sodomy, because the evidence fails to

support a finding that his conduct constituted “deviate sexual intercourse” as

defined by statute. In Point II, C.A.R.A. argues that allowing remote testimony by

the Juvenile Officer’s witnesses violated his right to confront the witnesses against

him. In Point III, C.A.R.A. argues that, if the Victim’s testimony by videoconference

violated his right to confrontation, then the circuit court also erred in admitting the

recording of the Victim’s forensic interview under § 491.075, because the Victim did

not “appear at trial,” and there was no showing that she was unavailable.

 We conclude that C.A.R.A.’s second and third Points have merit, and that he

is entitled to a new adjudicatory hearing because the circuit court violated his right

to confront the adverse witnesses. We separately address C.A.R.A.’s first Point,

however, which makes a sufficiency-of-the-evidence argument. “The[ ] same double
jeopardy principles [applicable to criminal prosecutions] have been applied to

 4
juvenile delinquency proceedings.” In re R.B., 186 S.W.3d 255, 257 (Mo. 2006)

(citing Breed v. Jones, 421 U.S. 519 (1975)). And in criminal cases, “[t]he double

jeopardy clause of the United States constitution precludes a second trial after a

reversal based solely on the insufficiency of evidence.” State v. Barber, 635 S.W.2d

342, 345 (Mo. 1982); accord State v. Lehman, 617 S.W.3d 843, 844 n.2 (Mo. 2021)

(“‘[I]f a conviction is reversed solely due to evidentiary insufficiency the double

jeopardy clause requires judgment of acquittal.’” (quoting State v. Liberty, 370

S.W.3d 537, 553 (Mo. 2012)). Therefore, because C.A.R.A.’s sufficiency-of-the-

evidence claim would entitle him to dismissal of the first-degree statutory sodomy

allegation, not merely a new trial, we consider Point I despite our disposition of

Points II and III. See, e.g., State v. Matthews, 552 S.W.3d 674, 681 n.6 (Mo. App.

W.D. 2018) (despite reversal for new trial based on erroneous admission of evidence,

separately considering a criminal defendant’s sufficiency-of-the-evidence

arguments); State v. Feldt, 512 S.W.3d 135, 154–55 (Mo. App. E.D. 2017) (same).

 “Review of juvenile proceedings is analogous to other court-tried cases. The

judgment must be affirmed unless it is not supported by substantial evidence, it is

against the weight of the evidence, or it erroneously declares or applies the law.”

J.N.C.B. v. Juv. Officer, 403 S.W.3d 120, 124 (Mo. App. W.D. 2013) (citations
omitted).

 I.
 In his first Point, C.A.R.A. argues that the evidence was insufficient to

establish that he committed acts which would constitute first-degree statutory

sodomy if committed by an adult.

 Under § 566.062.1, “[a] person commits the offense of statutory sodomy in the

first degree if he or she has deviate sexual intercourse with another person who is

less than fourteen years of age.” Section 566.010(3) defines “deviate sexual
intercourse” as

 5
 any act involving the genitals of one person and the hand, mouth,
 tongue, or anus of another person or a sexual act involving the
 penetration, however slight, of the penis, female genitalia, or the anus
 by a finger, instrument or object done for the purpose of arousing or
 gratifying the sexual desire of any person or for the purpose of
 terrorizing the victim.
 C.A.R.A. argues that the evidence was insufficient to establish that his act of

inserting his finger into the Victim’s vagina was “done for the purpose of arousing or

gratifying the sexual desire of any person or for the purpose of terrorizing the

victim.” We disagree.

 We apply the same standards to C.A.R.A.’s sufficiency-of-the-evidence

argument as are applied in criminal proceedings.

 In reviewing a challenge to the sufficiency of the evidence, this Court
 determines whether there was sufficient evidence from which a
 reasonable juror could have found the defendant guilty beyond a
 reasonable doubt. This standard remains the same whether the case is
 tried by a jury or the court. “In determining the sufficiency of the
 evidence, we ‘view the evidence and reasonable inferences which may
 be drawn therefrom in the light most favorable to the verdict and we
 ignore all evidence and inferences to the contrary.’” “This is not an
 assessment of whether the Court believes that the evidence at trial
 established guilt beyond a reasonable doubt but rather a question of
 whether, in light of the evidence most favorable to the State, any
 rational fact-finder could have found the essential elements of the
 crime beyond a reasonable doubt.” However, we will not supply
 missing evidence or give the state the benefit of unreasonable,
 speculative, or forced inferences.
In re D.E.W., 617 S.W.3d 514, 519-20 (Mo. App. E.D. 2021) (citations omitted); see

also J.N.C.B., 403 S.W.3d at 124.

 C.A.R.A. argues that, because of his age and the age of the Victim, the

evidence was insufficient to establish that he acted for the purpose of arousing or

gratifying his own, or the Victim’s, sexual desire. He relies principally on two cases

to make this argument: In re A.B., 447 S.W.3d 799 (Mo. App. W.D. 2014), and In re

J.A.H., 293 S.W.3d 116 (Mo. App. E.D. 2009). In both cases, this Court found that
convictions of juveniles for statutory sodomy had to be reversed, because there was

 6
insufficient evidence to establish that the perpetrator acted for sexual purposes. In

each case, this Court stressed that, when a case involved a pre-pubescent

defendant, the nature of the defendant’s actions could not, standing alone, give rise

to an inference that the defendant acted with sexual motives. A.B., 447 S.W.3d at

805-06; J.A.H., 293 S.W.3d at 121-22.

 We question whether A.B. and J.A.H. would require reversal in this case. In

A.B., although the defendant was twelve years old when he allegedly molested a

five-year-old boy, the undisputed evidence at trial indicated that the defendant’s

“knowledge of sexuality was that of a seven or eight-year-old developmentally.” 447

S.W.3d at 806. In J.A.H., the alleged offenses occurred when the defendant “was

eight or nine” years old. 293 S.W.3d at 122. In this case, by contrast, C.A.R.A. was

only a month short of his thirteenth birthday when the charged acts of abuse

occurred, and there was no indication that his level of sexual understanding or

maturity was significantly below his chronological age. Given the difference

between C.A.R.A.’s age, and the age and maturity of the perpetrators in J.A.H. and

A.B., those cases are distinguishable.

 Further, in both A.B. and J.A.H., the allegedly sexual acts were limited in

frequency and duration. In A.B., the acts allegedly “occurred on two or three
occasions in the summer of 2013,” and “[t]he incidents each lasted only a few

seconds.” 447 S.W.3d at 801, 804. J.A.H. involved two incidents: one in which the

defendant rubbed another child’s penis with a sponge in the shower, but stopped

when the other child asked him to; and the other in which the defendant “touche[d]

his penis to the mouth of a five or six year old” for an indeterminate period,

something less than a “significant duration of time.” 293 S.W.3d at 120, 121. In

this case, by contrast, the Victim stated that C.A.R.A. touched the inside of her

vagina “a lot of times,” despite her telling him to stop.

 7
 Ultimately, however, we need not determine whether the evidence was

sufficient to prove beyond a reasonable doubt that C.A.R.A. acted “for the purpose of

arousing or gratifying the sexual desire of any person.” Under § 566.010(3),

“deviate sexual intercourse” also includes acts done “for the purpose of terrorizing

the victim.” To “terrorize” means “‘to fill with terror or anxiety,’ ‘to coerce by threat

or violence.’” State v. Brock, 113 S.W.3d 227, 232 (Mo. App. E.D. 2003) (quoting

WEBSTER’S THIRD NEW INT’L DICTIONARY 2361 (1966)); see also State v. Harrell, 357

S.W.3d 256, 258 (Mo. App. E.D. 2012); State v. Chambers, 884 S.W.2d 113, 116 (Mo.

App. W.D. 1994), overruled on other grounds by State v. Santillan, 948 S.W.2d 574,

576 (Mo. 1997). “Anxiety,” in turn, is defined as “apprehensive uneasiness or

nervousness usually over an impending or anticipated ill : a state of being anxious.”

https://www.merriam-webster.com/dictionary/anxiety.

 The circuit court could reasonably find from the evidence, beyond a

reasonable doubt, that C.A.R.A. acted with the purpose to terrorize the Victim.

During her forensic interview, the Victim refused initially to even provide the

names she used to refer to the female breasts, genitals, or buttocks, saying that she

did not like to say the words aloud. The Victim’s extreme reticence to even name

these parts of the body supports an inference that C.A.R.A.’s touching of one of
those areas would have caused her extreme unease. When describing C.A.R.A.’s

actions, the Victim stated more than once that “he kept touching it and touching it

and I hate it,” and that C.A.R.A. “always touches my bottom part and I don’t like it.”

Indeed, when she first described the abuse during her forensic interview, the Victim

stated that “I didn’t like it so he didn’t stop.” During her trial testimony, the Victim

stated that C.A.R.A. “kept touching it and touching it and I said stop three times,”

but C.A.R.A. nevertheless continued his actions. Similarly, during her forensic

interview the Victim stated that C.A.R.A. did not stop touching the inside of her
vagina despite the fact that she asked him to stop. She also stated that C.A.R.A.

 8
did not stop after the Victim’s babysitter and her babysitter’s mother told him to

stop, but only when the Victim’s mother confronted him.

 This evidence was sufficient for the circuit court to find that C.A.R.A. acted

with the purpose of terrorizing the Victim, separate from any purpose to arouse or

gratify sexual appetites. It is a reasonable inference that Victim’s dislike and

hatred of what C.A.R.A. was doing would have been evident to him, and at least one

of Victim’s statements indicates that he continued to abuse her because she did not

like it. The Victim’s testimony and statements indicate that she told him to stop

more than once, yet C.A.R.A. persisted, and also continued to abuse the Victim even

after authority figures (a babysitter and the babysitter’s mother) confronted him.

The evidence would support the inference that, despite being aware that the Victim

hated what he was doing, and repeatedly asked him to stop, C.A.R.A. nevertheless

abused the Victim on multiple separate occasions, until forcefully confronted by the

Victim’s mother. The fact that C.A.R.A. knew his actions were wrong is established

by the fact that he told the Victim not to tell anyone what he had done, and that he

vehemently (and falsely) denied that he had done what the Victim alleged.

 In these circumstances, the evidence was sufficient for the circuit court, as

fact-finder, to conclude that C.A.R.A. engaged in actions which would constitute
first-degree statutory sodomy if committed by an adult. C.A.R.A.’s first Point is

denied.

 II.
 In his second Point, C.A.R.A. contends that the circuit court denied him his

rights to confrontation of adverse witnesses under the United States and Missouri

constitutions. In his third Point, C.A.R.A. argues that the recording of the Victim’s

forensic interview was erroneously admitted, because she did not “testif[y] at the

proceeding” within the meaning of § 491.075.1(2). We agree.

 9
 “The question of whether a defendant's rights under the Confrontation

Clause were violated by a ruling of the trial court is a question of law that we

review de novo.” State v. Hill, 247 S.W.3d 34, 39 (Mo. App. E.D. 2008).

 The Sixth Amendment to the United States Constitution provides that, “[i]n

all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with

the witnesses against him.” Similarly, Article 1, § 18(a) of the Missouri

Constitution provides that, “in criminal prosecutions the accused shall have the

right . . . to meet the witnesses against him face to face.” Despite its different

wording, “[t]he confrontation rights protected by the Missouri Constitution are the

same as those protected by the Sixth Amendment of the United States

Constitution.” State v. Justus, 205 S.W.3d 872, 878 (Mo. 2006).

 The right to confrontation recognized in the federal and Missouri

Constitutions applies by its terms only to criminal proceedings. Nevertheless, the

same confrontation right applies to this juvenile delinquency proceeding, even

though it may be denominated a civil case. “Juvenile proceedings must be in

conformity with the essentials of due process and fair treatment as guaranteed by

the Due Process Clause of the Fourteenth Amendment of the Constitution of the

United States. A proceeding in which a juvenile may be found to be delinquent and
subjected to the loss of his liberty is comparable in seriousness to a felony

prosecution.” In re S.H., 75 S.W.3d 286, 288 (Mo. App. E.D. 2002) (citing In re

Gault, 387 U.S. 1, 30 (1967)).

 In Gault, the Supreme Court of the United States held that due process

principles required that, “[a]bsent a valid confession adequate to support the

determination of the Juvenile Court, confrontation and sworn testimony by

witnesses available for cross-examination were essential for a finding of

‘delinquency’ and an order committing [a juvenile] to a state institution . . . .” 387
U.S. at 56. Citing Gault, the Missouri Supreme Court has explicitly held that “the

 10
constitutional protections applicable in criminal proceedings are also applicable in

juvenile delinquency proceedings due to the possibility of a deprivation of liberty

equivalent to criminal incarceration. Included among these rights are the rights to

confrontation and cross-examination of witnesses.” In re N.D.C., 229 S.W.3d 602,

605 (Mo. 2007); accord S.H., 75 S.W.3d at 288-89.

 The right to confront adverse witnesses in person is not absolute, however.

In Maryland v. Craig, 497 U.S. 836 (1990), the Supreme Court of the United States

held that “a defendant's right to confront accusatory witnesses may be satisfied

absent a physical, face-to-face confrontation at trial [(1)] only where denial of such

confrontation is necessary to further an important public policy and [(2)] only where

the reliability of the testimony is otherwise assured.” 497 U.S. at 850. The Court

explained that “[t]he requisite finding of necessity must of course be a case-specific

one: The trial court must hear evidence and determine whether use of [mechanisms

other than physical face-to-face testimony] is necessary to protect the welfare of the

particular . . . witness who seeks to testify.” Id. at 855.4 And in Coy v. Iowa, 487

U.S. 1012 (1988), the Court held that a defendant’s Confrontation Clause rights

were violated when a screen was placed between the defendant and minor witnesses

testifying to alleged sexual abuse. Although a state statute permitted the use of
such physical barriers based on a legislative determination that it was necessary to

protect abuse victims from trauma, the Court held that “something more than the

type of generalized finding underlying such a statute is needed” – namely,

 4 Craig’s analysis was based in part on Ohio v. Roberts, 448 U.S. 56 (1980). See
Craig, 497 U.S. at 850. In Crawford v. Washington, 541 U.S. 36, 60 (2004), the Supreme
Court overruled Roberts, and substantially modified the Court’s analysis of Confrontation
Clause issues. Crawford may raise questions concerning Craig’s continuing precedential
value. See United States v. Carter, 907 F.3d 1199, 1206 n.3 (9th Cir. 2018); State v. Griffin,
202 S.W.3d 670, 680-81 (Mo. App. W.D. 2006). Nevertheless, the Supreme Court of the
United States has made clear that “it is this Court's prerogative alone to overrule one of its
precedents.” State Oil Co. v. Khan, 522 U.S. 3, 20 (1997); accord Rodriguez de Quijas v.
Shearson/American Exp., Inc., 490 U.S. 477, 484 (1989).

 11
“individualized findings that these particular witnesses needed special protection.”

Id. at 1021.

 While neither the Missouri Supreme Court nor the Supreme Court of the

United States have addressed the issue, the majority of federal and state courts

hold that the Craig “necessity” standard must be satisfied before a witness is

permitted to testify by two-way videoconferencing. See, e.g., United States v. Carter,

907 F.3d 1199, 1208 n.4 (9th Cir. 2018); United States v. Abu Ali, 528 F.3d 210, 240-

41 (4th Cir. 2008); United States v. Yates, 438 F.3d 1307, 1313-14 (11th Cir. 2006);

United States v. Bordeaux, 400 F.3d 548, 554–55 (8th Cir. 2005); State v. Mercier,

479 P.3d 967, 975 (Mont. 2021) (noting that the “overwhelming majority of

jurisdictions have applied Craig to two-way video procedures”; collecting cases);

State v. Rogerson, 855 N.W.2d 495, 501-03 (Iowa 2014).

 The United States Court of Appeals for the Second Circuit adopted a different

approach in United States v. Gigante, 166 F.3d 75 (2d Cir. 1999). Gigante noted

that the Craig case involved testimony of a child sex-abuse victim using “one-way

closed-circuit television, whereby the witness could not possibly view the

defendant.” Id. at 81. In Gigante, however, the trial court employed two-way

videoconferencing technology, in which the witness and the defendant could each
see each other in real time. According to the Second Circuit, “[b]ecause [the trial

court] employed a two-way system that preserved the face-to-face confrontation

celebrated by Coy, it is not necessary to enforce the Craig standard in this case.” Id.

Rather than applying Craig’s “necessity” standard, Gigante held that where two-

way videoconferencing technology is employed,

 [a] more profitable comparison can be made to the Rule 15 deposition,
 which under the Federal Rules may be employed “[w]henever due to
 exceptional circumstances of the case it is in the interest of justice that
 the testimony of a prospective witness of a party be taken and
 preserved for use at trial.” Fed. R. Crim. P. 15(a). That testimony may
 then be used at trial “as substantive evidence if the witness is

 12
 unavailable.” Fed. R. Crim. P. 15(e). Unavailability is defined by
 reference to Rule 804(a) of the Federal Rules of Evidence, which
 includes situations in which a witness “is unable to be present or to
 testify at the hearing because of . . . physical or mental illness or
 infirmity.” Fed. R. Evid. 804(a)(4).
Id.5

 We need not decide whether the Craig standard, or instead the Gigante

analysis, is the proper test for Confrontation Clause challenges to the use of two-

way videoconferencing technology in juvenile delinquency proceedings. Whichever

standard applies, the circuit court failed to meet it. The court failed to make

findings either that denial of confrontation was “necessary to further an important

public policy,” Craig, 497 U.S. at 850, or that “exceptional circumstances” existed,

and that the Juvenile Officer’s witnesses were “unavailable” to testify due to

“physical or mental illness or infirmity” (or were “unavailable” for any other

reason). Gigante, 166 F.3d at 81 (quoting Fed. R. Crim P. 15 and Fed. R. Evid.

804(a)(4)). The circuit court justified its use of the WebEx two-way

videoconferencing technology by noting that “the [Missouri] Supreme Court has

permitted the use of Webex in all types of hearings at this time in the State of

Missouri.” Even if the Supreme Court had authorized the use of two-way

videoconferencing technology, such authorization does not establish that the use of

 5 In Guinan v. State, 769 S.W.2d 427 (Mo. 1989), the Missouri Supreme Court
held that “no constitutional violation [was] present” where an offender was required to
participate in an evidentiary hearing in his post-conviction relief proceeding by two-way
vidoconferencing. Id. at 431. The Court noted that the offender had been able to confer
privately with his attorney, and that “the cameras clearly and effectively conveyed both the
text and the content of the testimony and the demeanor of the persons testifying.” Id. In
Guinan, the offender had cited the Confrontation Clause, as well equal protection and due
process principles, to argue that he was entitled to be physically present. The Court
observed, however, that “[a] . . . post-conviction proceeding is a civil proceeding, and the
Sixth Amendment applies only during the pendency of the criminal case, not to the [post-
conviction relief] motion . . . .” Id. at 430. Given the Supreme Court’s explicit statement
that the Confrontation Clause was inapplicable, we do not read Guinan as deciding a
constitutional question similar to the one C.A.R.A. presents here.

 13
videoconferencing was necessary to further an important public policy in this case,

or that exceptional circumstances required the use of remote testimony.

 Under the Craig standard, “[w]hat is ‘necessary’ is a high bar.” United States

v. Casher, CR 19-65-BLG-SPW, 2020 WL 3270541, at *2 (D. Mont. June 17, 2020)

(denying witnesses’ request to testify by videoconference due to COVID-19

concerns); accord United States v. Kail, No. 18-CR-00172-BLF-1, 2021 WL 1164787

(N.D. Cal. March 26, 2021) (same). Considerations of convenience or added

expense, or a conclusion that particular procedures are “reasonable,” is not enough

to satisfy the Craig standard. See, e.g., Carter, 907 F.3d at 1208 (“a criminal

defendant’s constitutional rights cannot be neglected merely to avoid added expense

or inconvenience”); Yates, 438 F.3d at 1316 (requiring district court to make “case-

specific findings of fact that would support a conclusion that this case is different

from any other criminal prosecution in which the Government would find it

convenient to present testimony by two-way video conference.”); Mercier, 479 P.3d

at 976 (finding that Craig’s “necessity” prong was unsatisfied where the State

argued that “the use of the two-way video was permissible because, pursuant to the

public policy of judicial economy, it was unreasonable to incur significant travel

expenses and inconveniences for testimony [from out-of-state expert] deemed to be
purely foundational”).

 Applying the Craig “necessity” standard, federal district courts have held

that generalized concerns about the spread of COVID-19 did not justify denying a

criminal defendant’s Confrontation Clause rights without some specific showing

that an individual witness was particularly susceptible to the disease, and that

other precautionary measures would not adequately protect the witness. See, e.g.,

Kail, 2021 WL 1164787, at *1; United States v. Pangelinan, No. 19-10077-JWB,

2020 WL 5118550, at *4 (D. Kan. Aug. 31, 2020); Casher, 2020 WL 3270541, at *3.
In a case in which the court permitted a witness to testify by videoconferencing

 14
technology during the COVID-19 pandemic, the court relied on specific evidence

concerning the witness’ age, medical condition, and the necessity for cross-country

travel and a two-week quarantine on arrival. United States v. Donziger, No. 18-CR-

561 (LAP), 2020 WL 5152162, at *2 (S.D.N.Y. Aug. 31, 2020).6

 Although the Gigante standard may be less stringent than Craig’s “necessity”

test, testimony by deposition in criminal cases is “‘disfavored,’” and reserved for

“‘rare instances.’” United States v. Ordonez, 242 F. Supp. 3d 466, 471, 472 (E.D. Va.

2017) (citations omitted). “The standard for proving exceptional circumstances is

high and requires the movant make a good faith effort to make the desired witness

available before resorting to” the use of depositions. United States v. Donado, No.

4:18-CR-00144, 2021 WL 261000, at *2 (E.D. Tex. Jan. 25, 2021).

 Like the cases applying Craig’s “necessity” standard, cases applying the

“exceptional circumstances” test have required some specific showing of medical

conditions or risks faced by particular witnesses to justify the taking of testimony

using videoconferencing technology. See Gigante, 166 F.3d at 81 (citing “the

medical evidence of [the witness’s] poor health,” and “the joint exigencies of [the

witness]’s secret location [due to participation in witness protection program] and

 6 The specific considerations cited in Donziger are consistent with pre-
pandemic cases, which likewise authorized testimony by videoconference technology on a
specific showing of serious health conditions or safety risks. See, e.g., Horn v. Quarterman,
508 F.3d 306, 313–318 (5th Cir. 2007) (terminally ill witness); Lipsitz v. State, 442 P.3d
138, 144 (Nev. 2019) (victim residing at out-of-state drug treatment facility); White v. State,
116 A.3d 520, 540-47 (Md. Spec. App. 2015) (retired forensic serologist with serious back
pain caused by prior vertebrae-fusion surgery); State v. Seelig, 738 S.E.2d 427, 434-35 (N.C.
App. 2013) (out-of-state expert witness who suffered panic attacks from flying); New York v.
Wrotten, 923 N.E.2d 1099, 1100–1103 (N.Y. 2009) (85-year old with coronary disease); Bush
v. State, 193 P.3d 203, 214–216 (Wyo. 2008) (witness suffering from congestive heart
failure, cardiomyopathy, and chronic renal failure); Stevens v. State, 234 S.W.3d 748, 781-
83 (Tex. Ct. App. 2007) (75-year old witness with significant heart disease); State v. Sewell,
595 N.W.2d 207, 211–13 (Minn. App. 1999) (witness recovering from surgery on broken
neck, at risk of paralysis from travel).

 15
Gigante’s own ill health and inability to travel”); United States v. Benson, 79 Fed.

Appx. 813, 820-21 (6th Cir. 2003) (85-year-old witness who was “too ill to travel”

from California to Cleveland due to “extensive health problems” and recent “major

stomach surgery” which left her “underweight and fatigued”); United States v.

Akhavan, No. 20-CR-188 (JSR), 2021 WL 797806, at *9 (S.D.N.Y. Mar. 1, 2021)

(citing witness’ need for cross-country travel, as well as “his age and comorbidities,”

to find “severe risks of severe illness or death” from COVID-19); United States v.

Davis, No. 19-101-LPS, 2020 WL 6196741, at *4 (D. Del. Oct. 22, 2020) (relying on

“a combination of [multiple witnesses’] distance from Delaware and his or her

particularized risk factors”); Donziger, 2020 WL 5152162, at *3 (finding “exceptional

circumstances” due to witness’ age, documented health conditions which placed him

at heightened risk from COVID-19, and need for cross-country travel and lengthy

quarantine).

 In this case, no evidence whatsoever was presented to the circuit court

concerning the circumstances of, or any particular risks facing, the Victim, her

mother, or the other witness who testified on behalf of the Juvenile Officer. And the

circuit court made no finding that anything about the health or circumstances of

these three witnesses required that they be permitted to testify from a remote
location. We recognize that, in the context of an outbreak of an infectious disease

affecting the entire community, the Craig or Gigante standards might be satisfied

by generally applicable circumstances beyond the particulars of an individual case.

But the record contains no evidence, or findings, concerning the prevalence or risks

of COVID-19 in Jackson County or in Kansas City, or in the circuit court’s own

facilities, at the relevant time; concerning any community-wide resource or

logistical constraints; or concerning any community-wide restrictions which had

been put in place by health authorities. Moreover, any purported necessity of
permitting the Juvenile Officer’s witnesses to testify remotely is undercut by the

 16
fact that the circuit judge, the judge’s staff, C.A.R.A., and C.A.R.A.’s attorney, were

all physically present in the courtroom as the witnesses testified. Presumably, the

court found the safety measures in place in the courtroom to be sufficiently

protective to permit several individuals to be present. Whether we applied the

Craig or Gigante standards, the circuit court was required to offer some justification

for excluding the Juvenile Officer’s witnesses from the courtroom, in the face of

C.A.R.A.’s assertion of his constitutional right to confront those witnesses.

 The circuit court stated that the Supreme Court’s Operational Directives

“permitted” the hybrid hearing which the court conducted. Such a grant of

permission, on its own, would not satisfy the relevant standards for presentation of

remote testimony. In addition, however, the circuit court failed to acknowledge

significant limitations on the Supreme Court’s suspension of in-person proceedings

in its COVID-19-related Operational Directives. The Supreme Court’s Operational

Directives contain an exception from “[t]he suspension of in-person proceedings” for

“[p]roceedings pursuant to chapters 210 and 211 pertaining to juvenile delinquency

and abuse, neglect, and termination of parental rights.” Operational Directives

¶ C.2. Thus, C.A.R.A.’s adjudication hearing was not subject to the suspension of

in-person proceedings ordered by the Supreme Court. In addition, the Operational
Directives direct judges and court personnel “whenever possible to limit in-person

courtroom appearances to the extent not prohibited by constitutional or statutory

provisions.” Id. ¶ C.4 (emphasis added). The Administrative Order issued by the

Presiding Judge of the Sixteenth Judicial Circuit contains the same qualification.

Given the exclusion of juvenile delinquency proceedings from the suspension of in-

person proceedings, and the admonition that in-person proceedings may only be

limited if “not prohibited by constitutional . . . provisions,” the Supreme Court’s

Operational Directives provide little, if any, support for the circuit court’s order

 17
excusing the Juvenile Officer’s witnesses from physically attending the adjudication

hearing.

 We recognize the devastating toll that the COVID-19 pandemic has taken in

the United States, and the substantial impact the pandemic has had on all aspects

of American society. Nevertheless, generalized concerns about the virus may not

trump an individual’s constitutional right to confront adverse witnesses in a

juvenile detention proceeding, unless the court makes specific findings that the

circumstances prevailing at the time of a particular hearing, and the efficacy of

available precautionary measures, require that the juvenile and his accusers be

kept in separate physical locations. The circuit court failed to make such findings in

this case, and the Juvenile Officer failed to develop a record which would support

such findings.

 We accordingly conclude that C.A.R.A.’s Confrontation Clause rights were

violated when the Juvenile Officer’s witnesses were permitted to testify from a

remote location using the WebEx videoconferencing technology. Such a violation

does not require a new trial, however, if the State can demonstrate that the

violation of C.A.R.A.’s confrontation rights was “harmless beyond a reasonable

doubt under the standard of Chapman v. California, 386 U.S. 18, 24 (1967).” Coy,
487 U.S. at 1021. “An assessment of harmlessness cannot include consideration of

whether the witness' testimony would have been unchanged, or the [fact-finder’s]

assessment unaltered, had there been confrontation; such an inquiry would

obviously involve pure speculation, and harmlessness must therefore be determined

on the basis of the remaining evidence” untainted by the Confrontation Clause

violation. Id. at 1021-22; accord Hill, 247 S.W.3d at 42 (“[w]e evaluate

harmlessness by reviewing the remaining evidence” separate from the testimony

affected by Confrontation Clause violation).

 18
 In this case, all of the live testimony was taken in violation of C.A.R.A.’s right

to confrontation.

 In addition, a recording of the Victim’s forensic interview was admitted at the

adjudication hearing. But the admission of that recording itself violated C.A.R.A.’s

rights under the Confrontation Clause, as he argues in his third Point, because the

Victim did not testify in person during the adjudication hearing. The Victim’s

forensic interview was admitted into evidence under a statutory provision which

permits such extrajudicial statements to be admitted if they bear “sufficient indicia

of reliability,” but only if “the child . . . testifies at the proceeding[ ].” § 491.075.1(1),

(2)(a) (emphasis added). The statutory authorization for admission of out-of-court

statements in such circumstances is based on the principle that, “when the

declarant appears for cross-examination at trial, the Confrontation Clause places no

constraints at all on the use of his prior testimonial statements. . . . The Clause

does not bar admission of a statement so long as the declarant is present at trial to

defend or explain it.” Crawford v. Washington, 541 U.S. 36, 60 n. 9 (2004).

 As we have explained above, the Victim was not “present at trial,” and did

not “appear[ ] for cross-examination at trial” in a manner that complies with the

Confrontation Clause. Because the Victim’s live testimony did not satisfy the
Confrontation Clause, it cannot serve as the basis to admit her out-of-court

testimonial statements during her forensic interview, under § 491.075.1. See

Bordeaux, 400 F.3d at 556 (finding that trial court erred by admitting statements

made by child during forensic interview, where child’s live testimony by two-way

videoconferencing itself violated the Confrontation Clause; “AWH did not appear at

trial. A witness has not appeared for purposes of the confrontation clause when her

method of testifying violated that clause. AWH's testimony via closed-circuit

television violated the clause, and so we do not consider it when determining
whether she appeared at trial.” (citation omitted)).

 19
 Therefore, all of the live testimony, and the Victim’s statements during her

forensic interview, were admitted into evidence in violation of C.A.R.A.’s

Confrontation Clause rights. This was all of the evidence supporting the Juvenile

Officer’s allegation that C.A.R.A. had committed acts which would constitute first-

degree statutory sodomy. Given that all of the relevant evidence was erroneously

admitted, we cannot find that the violation of C.A.R.A.’s Confrontation Clause

rights was harmless beyond a reasonable doubt. Accordingly, we would reverse the

circuit court’s judgment sustaining the allegations of first-degree statutory sodomy,

and remand for further proceedings consistent with this opinion. As discussed

below, however, rather than finally disposing of C.A.R.A.’s appeal, we transfer this

case to the Missouri Supreme Court for decision.

 III.
 We conclude that it is appropriate for this Court to transfer this case to the

Missouri Supreme Court on our own motion under Rule 83.02, so that the Supreme

Court may address C.A.R.A.’s Confrontation Clause arguments. This issue presents

a question of “general interest or importance” within the meaning of Rule 83.02, for

multiple reasons. First, the COVID-19 pandemic, and the community-wide

restrictions on travel and meetings which were adopted to address the pandemic,

involve circumstances which have not existed in the United States in more than a

century. The manner of reconciling these unique circumstances with the

Confrontation Clause rights of an accused juvenile or criminal defendant presents a

novel question on which a uniform State-wide resolution is necessary. Further,

because the pandemic affected the entire State (and Nation), there are likely

multiple cases in which similar issues may arise. The Missouri Supreme Court has

taken an active role throughout the pandemic to specify the manner in which courts

could operate, and it is important that the Supreme Court decide whether the

 20
circuit court properly interpreted and applied the Supreme Court’s Operational

Directives.

 Finally, we note the different approaches taken by courts across the country

concerning the use of two-way videoconferencing in proceedings subject to the

Confrontation Clause. Quite apart from the pandemic, the legality of using

videoconferencing technology in proceedings like this one presents an important

question on which guidance from the Supreme Court would be helpful – particularly

as the use of such videoconferencing technology becomes more frequent. We note

that the Eastern District recently transferred a case to the Supreme Court involving

a Confrontation Clause challenge to testimony presented by two-way

videoconferencing. See State v. Smith, No. ED108626, 2021 WL 1619283 (Mo. App.

E.D. April 27, 2021), on transfer, No. SC99086. The fact that the Supreme Court

will already be addressing a closely related case provides further justification for

our transfer order here.

 Conclusion
 For the reasons explained in this opinion, we would be inclined to reverse the

circuit court’s judgment, and remand for a new adjudication hearing in which

C.A.R.A.’s rights under the Confrontation Clause were respected. Given the general

interest and importance of the questions presented, however, we do not finally

decide C.A.R.A.’s appeal, but instead transfer his appeal to the Missouri Supreme

Court pursuant to Rule 83.02.

 Alok Ahuja, Judge
All concur.

 21