SUPREME COURT OF MISSOURI
 en banc
IN THE INTEREST OF: C.A.R.A., ) Opinion issued January 11, 2022
 )
 Appellant, )
 )
v. ) No. SC99231
 )
JACKSON COUNTY JUVENILE )
OFFICE, )
 Respondent. )

 APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
 The Honorable Jalilah Otto, Judge

 The Jackson County circuit court found C.A.R.A. committed acts that would

constitute first-degree statutory sodomy if committed by an adult. C.A.R.A. appeals,

arguing the circuit court erred in permitting witness testimony via two-way live video

because it violated C.A.R.A.'s right to confrontation under the United States Constitution

and the Missouri Constitution. The circuit court's judgment is vacated, and the case is

remanded.

 Facts and Procedural History

 The Jackson County juvenile officer filed a first amended petition, alleging

C.A.R.A. committed acts that would constitute first-degree statutory sodomy if
committed by an adult. 1 The juvenile officer alleged C.A.R.A. had deviate sexual

intercourse with S.V. by inserting C.A.R.A.'s finger into S.V.'s vagina. At the time of the

alleged offense, C.A.R.A. was 12 years old and S.V. was five years old.

 The adjudication hearing was continued multiple times at C.A.R.A.'s request.

Prior to the adjudication hearing, C.A.R.A. filed an "Objection to Virtual Adjudication,

and Request to Appear in Person" and argued C.A.R.A. had a constitutional and statutory

right to face-to-face confrontation of witnesses. The juvenile officer filed a "Response to

[C.A.R.A.]'s Objection to Virtual Adjudication" and argued the adjudication hearing

should be held via videoconferencing technology due to the COVID-19 pandemic. In his

argument, the juvenile officer cited this Court's order, In re: Operational Directives for

Easing COVID-19 Restrictions on In-Person Proceedings, 2 and the Sixteenth Circuit's

order, In Re: Updated Court Operations upon Re-Opening of Courthouses. 3

 The adjudication hearing was conducted using a "hybrid" format. C.A.R.A.

renewed the objection to the witnesses testifying remotely via two-way video. The

circuit court overruled the objection, stated its reasoning for doing so, and described the

hybrid set up as follows:

1
 The Jackson County juvenile officer originally alleged four counts, two of which C.A.R.A.
admitted and one of which the juvenile officer dismissed. None of these additional counts are at
issue for this appeal.
2
 Exhibit A, Supreme Court of Missouri en banc, In re: Operational Directives for Easing
COVID-19 Restrictions on In-Person Proceedings (May 4, 2020).
3
 Exhibit B, Circuit Court of Jackson County, Missouri, 16th Judicial Circuit, In Re: Updated
Court Operations upon Re-Opening of Courthouses Administrative Order 2020-084 (May 14,
2020).

 2
 [I]n reviewing the Supreme Court [of Missouri] order and [the
 Sixteenth Circuit]'s order that were put in place in response to the
 COVID-19 pandemic that has affected the entire world, the Supreme Court
 [of Missouri] has permitted the use of Webex in all types of hearings at this
 time in the State of Missouri.
 So we have a hybrid here. Just for the record, the setup is such that I
 am in the courtroom with my staff. [C.A.R.A.'s attorney] is here.
 [C.A.R.A.] is here. [C.A.R.A.'s grandparents] are here in the courtroom on
 the Webex camera. The juvenile officer, as well as the witnesses that are
 going to be called today, are also on the Webex. Counsel for the placement
 providers are on the Webex. As well as [C.A.R.A.'s] mother is on the
 Webex and counsel for mother is also on the Webex.
 I recognize that there are times where technical difficulties can be
 quite challenging in these types of hearings. If those challenges arise, we
 can always suspend the proceedings, but as of right now, we're not having
 any of those issues. There also is a camera pointed to the gallery or the
 well of the courtroom so everyone on the Webex cannot [sic] only see me,
 but they can also see the courtroom, including [C.A.R.A.] and [C.A.R.A.'s
 attorney].
 And there's a large . . . chalkboard-sized projection on the wall of
 what's going on with the Webex. So [C.A.R.A.'s attorney] and [C.A.R.A.]
 can see who is on the Webex call and who is talking at any given time. So
 everyone can see everyone basically in realtime.
 There's also a way to share exhibits electronically with everyone on
 the Webex call, as well as any impeachable material can also be shared in
 that manner. And with that being said . . . I will order that we are going
 forward at this time in this manner.

 Contrary to the circuit court's statements, this Court was careful to ensure its order

incorporating the operational directives would not be interpreted to permit the violation

of a juvenile's constitutional or statutory rights. Whether a hearing was required to be

held during a pandemic—or continued until a hearing could be held safely—is a different

issue from whether the law requires a hearing to be held in person and the witnesses be

required to appear face-to-face. Once a circuit court determines an adjudication hearing

must be held, nothing in this Court's Operational Directives expressly permit witnesses to

appear remotely.

 3
 This Court's Operational Directives, entered May 4, 2020, specifically provided

that "[p]roceedings pursuant to chapters 210 and 211 pertaining to juvenile delinquency"

were excluded from the provisions allowing for remote proceedings. In re: Operational

Directives, supra note 2 at C(2). After listing that exception and other exceptions, this

Court directed:

 Courts may set in-person hearings in the above listed proceedings but it
 does not mandate a judge set a hearing in any individual case. The
 presiding judge of each circuit court and the chief judges of each appellate
 court are authorized to determine the manner in which the listed in-person
 exceptions are to be conducted. Such proceedings shall be limited to the
 attorneys, parties, witnesses, security officers, and other individuals
 necessary to the proceedings as determined by the judge presiding over
 the proceedings. The judge presiding over such proceedings has the
 discretion to excuse jurors or other individuals who cannot or should not
 appear as a result of risks associated with COVID-19.

Id. (emphasis added).

 This Court specifically cautioned about the requirement for in-person proceedings

in delinquency adjudications. Id. This Court gave circuit court presiding judges the

discretion to determine the manner of in-person proceedings. Id. But this Court

specifically provided that parties, attorneys, and witnesses were among the people who

are physically present at in-person proceedings. See id. Nothing in this Court's directives

encouraging remote proceedings for many types of hearings supports the circuit courts

determination that remote proceedings were authorized in this case irrespective of the

juvenile's statutory and constitutional rights. In other words, nothing in this Court's

directives permitted the circuit court to deny C.A.R.A.'s request for in-person

 4
adjudication proceedings, over the objection of an accused to have the witnesses against

him appear face-to-face.

 The juvenile officer presented two-way video testimony from S.V., S.V.'s mother,

and S.V.'s babysitter. The juvenile officer also presented evidence, over C.A.R.A.'s

objection, of a video recording of S.V.'s forensic interview, a summary of the interview,

and a marked-up anatomical drawing used during the interview. At the close of the

juvenile officer's evidence, C.A.R.A. moved for a judgment of acquittal, which was

overruled. C.A.R.A. did not present any evidence.

 The circuit court sustained the allegation of first-degree statutory sodomy, beyond

a reasonable doubt. 4 After a dispositional hearing, the court ordered C.A.R.A. be

committed to the custody of the Director of Family Court Services for residential

placement. C.A.R.A. appealed, and the court of appeals issued an opinion but then

transferred the case to this Court pursuant to Rule 83.02. This Court has jurisdiction

pursuant to article V, § 10 of the Missouri Constitution.

 Standard of Review

 "Juvenile proceedings are reviewed in the same manner as other court-tried cases."

D.C.M. v. Pemiscot Cnty. Juv. Off., 578 S.W.3d 776, 786 (Mo. banc 2019) (internal

quotations omitted). "This Court will affirm a judgment in a juvenile proceeding unless it

is not supported by evidence, is against the weight of evidence, or erroneously declares or

applies the law." Id. "[T]he constitutional protections applicable in criminal proceedings

are also applicable in juvenile delinquency proceedings due to the possibility of a

4
 The circuit court also sustained the allegations C.A.R.A. previously admitted.

 5
deprivation of liberty equivalent to criminal incarceration." In re N.D.C., 229 S.W.3d

602, 605 (Mo. banc 2007). "Included among these rights are the rights to confrontation

and cross-examination of witnesses." Id.

 Whether a person's rights were violated under the Confrontation Clause is a

question of law this Court reviews de novo. State v. Justus, 205 S.W.3d 872, 878 (Mo.

banc 2006). "Properly preserved confrontation clause violations are presumed

prejudicial." Id. at 881.

 Analysis

 C.A.R.A. argues the two-way live video testimony of S.V., S.V.'s mother, and

S.V.'s babysitter at the adjudication hearing violated C.A.R.A.'s right to confrontation,

cross-examination, due process, and effective assistance of counsel under the United

States Constitution, U.S. Const. amends. VI, XIV, and the Missouri Constitution, Mo.

Const. art. I, §§ 10, 18(a). C.A.R.A. properly preserved the Confrontation Clause

violation for appeal by objecting to the virtual testimony before and at the adjudication

hearing.

 The Sixth Amendment's Confrontation Clause states "[i]n all criminal

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

against him." U.S. Const. amend. VI. "[T]he Sixth Amendment's right of an accused to

confront the witnesses against him is . . . made obligatory on the States by the Fourteenth

Amendment." Pointer v. Texas, 380 U.S. 400, 403 (1965). The right to confrontation is

"a fundamental right essential to a fair trial in a criminal prosecution." Id. at 404;

 6
see also U.S. Const. amend. XIV ("No state shall . . . deprive any person of life, liberty,

or property, without due process of law.").

 The United States Supreme Court has not addressed the use of two-way live video

feed in a criminal or juvenile adjudication proceeding and its impact on the right to

confrontation. Three United States Supreme Court cases, however, examine a criminal

defendant's right to confront adverse witnesses against him or her when that witness

testimony falls short of in-person, face-to-face confrontation: Coy v. Iowa, 487 U.S. 1012

(1988), Maryland v. Craig, 497 U.S. 836 (1990), and Crawford v. Washington, 541 U.S.

36 (2004).

 In Coy, the Supreme Court found a defendant's confrontation rights were violated

when, pursuant to an Iowa statute, a large screen was placed between the defendant and

minor witnesses testifying about alleged sexual abuse. 487 U.S. at 1014. After a

discussion about the historical significance of the right to confrontation, the Supreme

Court stated: "We have never doubted . . . that the Confrontation Clause guarantees the

defendant a face-to-face meeting with witnesses appearing before the trier of fact." Id. at

1016. This guarantee, the Supreme Court said, "relate[s] both to appearances and to

reality," id. at 1017, and "[t]he perception that confrontation is essential to fairness has

persisted over the centuries because there is much truth to it," id. at 1019. The Supreme

Court noted, although "[t]he Confrontation Clause does not, of course, compel the

witness to fix his eyes upon the defendant," the Clause "ensure[s] the integrity of the

fact-finding process" by allowing the trier of fact to observe the witness and "draw its

own conclusions." Id. at 1019-20 (alteration omitted). Ultimately, the Supreme Court

 7
said the "rights conferred by the Confrontation Clause are not absolute, and may give

way to other important interests." Id. at 1020. The Supreme Court found the Iowa statute

authorizing the testimony behind a screen violated the defendant's confrontation rights

because there were "no individualized findings that these particular witnesses needed

special protection." Id. at 1021. The Supreme Court added "something more than the

type of generalized finding underlying such a statute is needed." Id. The Supreme Court

declined to address "whether any exceptions exist" to the right of confrontation. Id.

 The Supreme Court revisited the issue in Craig and rejected a Confrontation

Clause challenge to a Maryland statute allowing a child abuse victim to testify via

one-way, closed-circuit television, in certain circumstances. 497 U.S. at 860. The

Maryland statute "permits a judge to receive, by one-way closed-circuit television, the

testimony of a child witness who is alleged to be a victim of child abuse." Id. at 840.

"To invoke the procedure, the trial judge must first 'determin[e] that testimony by the

child victim in the courtroom will result in the child suffering serious emotional distress

such that the child cannot reasonably communicate.'" Id. at 840-41 (alteration in original)

(citing Md. Cts. & Jud. Proc. Code. Ann. § 9-102(a)(1)(ii)).

 Once the procedure is invoked, the child witness, prosecutor, and defense
 counsel withdraw to a separate room; the judge, jury, and defendant remain
 in the courtroom. The child witness is then examined and cross-examined
 in the separate room, while a video monitor records and displays the
 witness' testimony to those in the courtroom. During this time the witness
 cannot see the defendant. The defendant remains in electronic
 communication with defense counsel, and objections may be made and
 ruled on as if the witness were testifying in the courtroom.

 8
Id. at 841-42. The trial court allowed the testimony, the Maryland Court of Special

Appeals affirmed, and the Court of Appeals of Maryland reversed and remanded for a

new trial but rejected the Confrontation Clause violation argument. Id. at 843. The

Supreme Court of the United States vacated and remanded. Id. at 860. The Supreme

Court held "a defendant's right to confront accusatory witnesses may be satisfied absent a

physical, face-to-face confrontation at trial only where denial of such confrontation is

necessary to further an important public policy and only where the reliability of the

testimony is otherwise assured." Id. at 850. The Supreme Court stated "the

Confrontation Clause reflects a preference for face-to-face confrontation," id. at 849

(emphasis omitted) (citing Ohio v. Roberts, 448 U.S. 56, 63 (1980)), but criminal

defendants do not have "the absolute right to a face-to-face meeting with witnesses

against them at trial," id. at 844 (emphasis omitted). The Supreme Court acknowledged

"use of the one-way closed-circuit television procedure, where necessary to further an

important state interest, does not impinge upon the truth-seeking or symbolic purposes of

the Confrontation Clause." Id. at 852. However, "[t]he requisite finding of necessity

must of course be a case-specific one." Id. at 855. The Supreme Court set out three

findings necessary to establish whether the case furthers an important public policy:

 The trial court must hear evidence and determine whether use of the
 one-way closed-circuit television procedure is necessary to protect the
 welfare of the particular child witness who seeks to testify. The trial court
 must also find that the child witness would be traumatized, not by the
 courtroom generally, but by the presence of the defendant. . . . Finally, the
 trial court must find that the emotional distress suffered by the child witness
 in the presence of the defendant is more than de minimis, i.e., more than
 "mere nervousness or excitement or some reluctance to testify[.]"

 9
Id. at 855-56 (internal citations omitted). However, just because "the face-to-face

confrontation requirement is not absolute does not, of course, mean that it may easily be

dispensed with." Id. at 850. 5

 In 2004, the Supreme Court established a new framework for analyzing a

defendant's rights under the Sixth Amendment. Crawford, 541 U.S. at 36. The Supreme

Court held "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands

what the common law required: unavailability and a prior opportunity for

cross-examination." Id. at 68. The Supreme Court overruled Ohio v. Roberts and its

"indicia of reliability" test. Id. at 68-69. After an examination of the history of the Sixth

Amendment, the Supreme Court stated "the principal evil at which the Confrontation

Clause was directed was the civil-law mode of criminal procedure, and particularly its

use of ex parte examinations as evidence against the accused," id. at 50, and "the Framers

would not have allowed admission of testimonial statements of a witness who did not

appear at trial unless he was unavailable to testify, and the defendant had had a prior

opportunity for cross-examination," id. at 53-54. The Supreme Court expressed

disapproval of the unpredictable and subjective nature of balancing tests. Id. at 63-64.

The Supreme Court also stated the Roberts balancing test was "so improbable that it

reveals a fundamental failure on our part to interpret the Constitution in a way that

secures its intended constraint on judicial discretion." Id. at 67. "By replacing

5
 The Craig Court recognized the one-way procedure it approved does not ordinarily satisfy
confrontation requirements. Craig, 497 U.S. at 853 ("[A] State's interest in the physical and
psychological well-being of child abuse victims" may be sufficient to "outweigh . . . a
defendant's right to face his or her accusers in court" in only some cases.).

 10
categorical constitutional guarantees with open-ended balancing tests, we do violence to

[the Framers'] design." Id. at 67-68.

 The Supreme Court has identified two purposes of the Confrontation Clause: the

truth-seeking purpose and the symbolic purpose. Craig, 497 U.S. at 852. The

truth-seeking purpose includes notions of promoting reliability, impressing upon

witnesses the seriousness of their testimony, allowing the trier of fact to observe the

demeanor of witnesses, and subjecting the witnesses to cross-examination. See Coy, 487

U.S. at 1019 ("A witness may feel quite differently when he has to repeat his story

looking at the man whom he will harm greatly by distorting or mistaking the facts . . .

even if [a] lie is told, it will often be told less convincingly." (internal quotation

omitted)); Craig, 497 U.S. at 846 (The Confrontation Clause "ensur[es] that evidence

admitted against an accused is reliable and subject to the rigorous adversarial testing that

is the norm of Anglo-American criminal proceedings. . . . [F]ace-to-face confrontation

enhances the accuracy of factfinding by reducing the risk that a witness will wrongfully

implicate an innocent person."); California v. Green, 399 U.S. 149, 158 (1970)

("Confrontation: (1) insures that the witness will give his statements under oath—thus

impressing him with the seriousness of the matter and guarding against the lie by the

possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination,

the greatest legal engine ever invented for the discovery of truth; (3) permits the jury that

is to decide the defendant's fate to observe the demeanor of the witness in making his

statement, thus aiding the jury in assessing his credibility." (internal quotation omitted));

 11
Lee v. Illinois, 476 U.S. 530, 540 (1986) ("The right to confront and to cross-examine

witnesses is primarily a functional right that promotes reliability in criminal trials.").

 The symbolic purpose consists of promoting "an open and even contest in a public

trial." Lee, 476 U.S. at 540 ("[T]he Constitution provides certain safeguards to promote

to the greatest possible degree society's interest in having the accused and accuser engage

in an open and even contest in a public trial."); Coy, 487 U.S. at 1017 ("[T]here is

something deep in human nature that regards face-to-face confrontation between accused

and accuser as essential to a fair trial in a criminal prosecution." (internal quotation

omitted)).

 Other jurisdictions addressing whether witness testimony via two-way live video

satisfies the Confrontation Clause generally follow one of three approaches: (1) Craig,

(2) the Second Circuit's test in Gigante, or (3) Crawford. See infra United States v.

Gigante, 166 F.3d 75 (2d Cir. 1999).

 A.

 Most federal and state courts that have addressed this issue utilize Craig's test.

These courts hold a defendant's rights under the Confrontation Clause are violated by the

use of two-way video procedure unless such procedure is necessary to further an

important public policy and the reliability of the testimony is otherwise assured. See

generally State v. Mercier, 479 P.3d 967, 976 (Mont. 2021); Haggard v. State, 612

S.W.3d 318, 325-26 (Tex. Crim. App. 2020); United States v. Carter, 907 F.3d 1199,

1208 (9th Cir. 2018); State v. Thomas, 376 P.3d 184, 193-94 (N.M. 2016); United States

v. Abu Ali, 528 F.3d 210, 240-41 (4th Cir. 2008); Bush v. State, 193 P.3d 203, 214-15

 12
(Wyo. 2008); United States v. Yates, 438 F.3d 1307, 1314 (11th Cir. 2006); United States

v. Bordeaux, 400 F.3d 548, 554 (8th Cir. 2005).

 Craig's holding has widely been interpreted to allow child sex abuse victims to

testify via two-way video, as well as one-way video. See, e.g., Bordeaux, 400 F.3d at

554. Some courts have extended Craig to apply to adult witnesses, as well as child

witnesses, in all cases of two-way video. See, e.g., Carter, 907 F.3d at 1206 ("We now

make clear that a defendant's right to physically confront an adverse witness (whether

child or adult) cannot be compromised by permitting the witness to testify by video

(whether one-way or two-way) unless Craig's standard is satisfied.").

 The reliability portion of Craig's test is met by a "combined effect of these

elements of confrontation—physical presence, oath, cross-examination, and observation

of demeanor by the trier of fact." Craig, 497 U.S. at 846. Because the Craig Court stated

the combination of oath, cross-examination, and observation of a witness's demeanor

"adequately ensures that the testimony is both reliable and subject to rigorous adversarial

testing in a manner functionally equivalent to that accorded live, in-person testimony,"

the reliability portion of Craig's test is generally not discussed in detail by courts. Id. at

851.

 Craig's test requires courts to engage in a case-specific finding to analyze the

necessity prong. There is not much uniformity across jurisdictions as to what this prong

requires or what satisfies it. It is widely held that convenience, efficiency, and cost are

insufficient to support the necessity prong. See generally Thomas, 376 P.3d at 195; State

v. Rogerson, 855 N.W.2d 495, 507 (Iowa 2014); Commonwealth v. Atkinson, 987 A.2d

 13
743, 750 (Pa. Super. Ct. 2009). But that is not always the case. See Harrell v. State, 709

So. 2d 1364, 1370 (Fla. 1998) (finding the "important state interest in resolving criminal

matters in a manner which is both expeditious and just" satisfied the necessity prong of

Craig). Conversely, permanent illness, the existence of no viable alternatives to the

two-way video, and the witness being located outside the United States have been found

sufficient to support the necessity prong. 6 See generally Carter, 907 F.3d at 1208-09;

Rogerson, 855 N.W.2d at 506-07; Atkinson, 987 A.2d at 748; Bush, 193 P.3d at 215-16;

Horn v. Quarterman, 508 F.3d 306, 319-20 (5th Cir. 2007); Yates, 438 F.3d at 1316.

Under this prong, "important public policy" is a policy that would generally affect more

than one case. See, e.g., Yates, 438 F.3d at 1316 ("[T]he prosecutor's need for the video

conference testimony to make a case and to expeditiously resolve it are not the type of

6
 Common "viable alternatives" to two-way video include issuing a continuance and obtaining a
pre-trial deposition. Missouri Rule 25.14 permits a prosecuting attorney or defense attorney to
file a motion to take the deposition of a witness to preserve such testimony. A defendant has a
right to attend the deposition or "personally waive the right to be present and the right of
confrontation in writing or in open court." Rule 25.14. The deposition may be used by either
party at trial, with Rule 25.13 governing if offered by the defendant and Rule 25.16 governing if
offered by the State. As relevant here, Rule 25.16 allows the state to use the deposition if the
defendant
 (1) Was personally present at the deposition and had the right of confrontation
 and cross-examination at the deposition, or (2) Personally waived that right to be
 present and the right of confrontation in writing or in open court, or (3) Failed to
 attend the deposition after the court ordered defendant to do so.
Rule 25.16(a)(1)-(3). The State must also show the witnesses is unavailable because the witness
 (1) Is dead, (2) Is unable to attend or testify because of sickness or infirmity,
 (3) Has invoked a testimonial privilege or other refusal to testify not produced by
 the action of the state, or (4) Is otherwise unavailable and the state has made a
 good faith effort to obtain the presence of the witness at the hearing or trial, but
 has been unable to procure the attendance of the witness.
Rule 25.16(b)(1)-(4). A pretrial deposition is also available under Federal Rule of Criminal
Procedure 15.

 14
public policies that are important enough to outweigh the Defendants' rights to confront

their accusers face-to-face.").

 In the specific context of the COVID-19 pandemic, some courts applying Craig's

test recognize protecting the public health is an important public policy. See Vazquez

Diaz v. Commonwealth, 167 N.E.3d 822, 838 (Mass. 2021). But witness-specific

findings of a particular risk associated with COVID-19, such as having an underlying

health condition or testing positive for COVID-19 during the time period the testimony is

set to occur, are required to meet the necessity prong. See State v. Comacho, 960 N.W.2d

739, 754-56 (Neb. 2021); Commonwealth v. Gardner, No. 2020-CA-1383-MR, 2021 WL

3573304, at *3-4 (Ky. Ct. App. Aug. 13, 2021) (unpublished opinion); United States v.

Kail, No. 18-CR-00172-BLF-1, 2021 WL 1164787, at *1 (N.D. Cal. Mar. 26, 2021);

People v. Warner, No. ST-17-CR-031, 2020 WL 8019120, at *2 (V.I. Super. Ct. Nov. 2,

2020) (mem.); United States v. Pangelinan, No. 19-10077-JWB, 2020 WL 5118550, at

*3-4 (D. Kan. Aug. 31, 2020); United States v. Casher, No. CR 19-65-BLG-SPW, 2020

WL 3270541, at *2-3 (D. Mont. June 17, 2020).

 Whether a continuance is a viable alternative to two-way video testimony during

the COVID-19 pandemic is unclear. Compare Casher, 2020 WL 3270541, at *3 ("In this

case, there are no realistic alternatives available to the Court. First, the Court already

considered a continuance but found it impracticable. COVID-19 is unprecedented as

much as it is unpredictable. . . . [T]here is no way for the Court to know when the crisis

will end." (internal citation omitted)); and Commonwealth v. Masa, No. 1981CR0307,

2020 WL 4743019, at *5 (Mass. Super. Aug. 10, 2020) (unpublished opinion) ("There

 15
seems to be little chance that these risks will have materially diminished by late October,

if the Court were to grant [the defendant]'s request to put off his hearing until then."),

with Pangelinan, 2020 WL 5118550, at *4 ("[T]he court could . . . continue this matter

until the transmission rate of the virus improves. . . . Under the circumstances here, there

are reasonable alternatives which would allow this case to proceed, including a

continuance."). Kail described an additional viable alternative to two-way video

testimony when a witness claimed a medical accommodation to testifying in person:

"[T]he Court recognizes the medical hardship [the witness] faces, and will reduce the

number of people in the courtroom to a bare minimum and locate people as far from the

witness stand as practically possible during his testimony." 2021 WL 1164787, at *1.

 In addressing the reliability prong of Craig's test in the context of the COVID-19

pandemic, at least one court has discussed the specific type of testimony at issue, to

weigh the importance of a credibility judgment as to that particular witness.

See Comacho, 960 N.W.2d at 756 (A witness was allowed to testify via two-way video to

translate portions of telephone calls because it "was not testimony in which an assessment

of credibility was as vital or as nuanced as it would be for testimony by the victim of the

crime charged or by an eyewitness" and the jury could "listen to the calls and determine

whether [the witness's] translations appeared reliable in context.").

 B.

 As a departure from Craig, the Second Circuit established a more lenient standard.

In Gigante, the Second Circuit allowed a witness to testify via two-way live video

because of the witness's "fatal illness and participation in the Federal Witness Protection

 16
program" as well as the defendant's refusal to attend a Rule 15 deposition due to ill

health. 166 F.3d at 81-82. The Second Circuit determined "it is not necessary to enforce

the Craig standard" because the two-way video, as opposed to one-way, "preserved the

face-to-face confrontation celebrated [in] Coy." Id. at 81. The Second Circuit made a

"more profitable comparison" to the standard for a Rule 15 deposition and held, "[u]pon a

finding of exceptional circumstances, . . . a trial court may allow a witness to testify via

two-way closed-circuit television when this furthers the interest of justice." Id.

Ultimately, the Second Circuit concluded testimony via two-way live video "afforded

greater protection of [the defendant]'s confrontation rights than would have been

provided by a Rule 15 deposition" because the jury could judge the witness's "credibility

through his demeanor and comportment." Id. In making this conclusion, however, the

Second Circuit recognized "[t]here may well be intangible elements of the ordeal of

testifying in a courtroom that are reduced or even eliminated by remote testimony." Id.

Gigante has been adopted only in one other circuit, and it was an unpublished opinion.

See United States v. Benson, 79 F. App'x 813, 821 (6th Cir. 2003).

 Federal district courts in the Second Circuit applying Gigante in the context of the

COVID-19 pandemic and require witness-specific findings of a particular risk associated

with COVID-19 to meet the exceptional circumstances standard. See United States v.

Akhavan, 523 F. Supp. 3d 443, 455 (S.D.N.Y. 2021); United States v. Donziger,

No. 11-CV-691 (LAK), 2020 WL 5152162, at *2-3 (S.D.N.Y. Aug. 31, 2020); see also

United States v. Davis, No. 19-101-LPS, 2020 WL 6196741, at *2-4 (D. Del. Oct. 22,

2020) (applying Gigante because "[n]either the parties nor the Court has found any

 17
controlling Third Circuit law concerning the use of remote videoconferencing technology

to provide live witness testimony during a jury trial in a criminal case").

 C.

 A third approach is to apply Crawford to cases involving two-way video

procedures. People v. Jemison, 952 N.W.2d 394, 396 (Mich. 2020). 7 It is beyond debate

that for two decades preceding Crawford, reliability was the touchstone of the Supreme

Court's Confrontation Clause doctrine. In Roberts, the Supreme Court held the

Confrontation Clause was not a barrier for admission of a hearsay declarant's statement if

the testimony bore adequate "indicia of reliability." 448 U.S. at 66. Crawford overruled

Roberts and transformed the Supreme Court's approach to the Confrontation Clause

doctrine from a case-by-case reliability-balancing test to a categorical rule: "Where

testimonial statements are at issue, the only indicium of reliability sufficient to satisfy

constitutional demands is the one the Constitution actually prescribes: confrontation."

Crawford, 541 U.S. at 68-69.

 Craig, decided before Crawford, operated under the Roberts "indicia of reliability"

framework. In Craig, the Supreme Court identified four considerations courts should

weigh to determine reliability—physical presence, whether the testimony was taken

under oath, whether the accused had an opportunity to cross-examine, and whether the

jury could observe the witness's demeanor. 497 U.S. at 845-46. After weighing the four

7
 A few courts have suggested Crawford and Craig co-exist. See e.g., Bordeaux, 400 F.3d at
554-57 (applying Craig to a child's live testimony via two-way video at trial, and applying
Crawford to a child's out-of-court statements to a forensic interviewer); Yates, 438 F.3d at 1314
n.4 ("Crawford applies only to testimonial statements made prior to trial, and the live two-way
video testimony at issue in this case was presented at trial.").

 18
factors, the Supreme Court determined the one-way video testimony was reliable and

held admitting it was justified "where necessary to protect a child witness from trauma

that would be caused by testifying in the physical presence of the defendant, at least

where such trauma would impair the child's ability to communicate." Id. at 857.

 Justice Scalia dissented in Craig. He rejected the majority's reliability balancing

test, arguing it eliminated the right to confrontation because "the Confrontation Clause

does not guarantee reliable evidence; it guarantees specific trial procedures that were

thought to assure reliable evidence, undeniably among which was 'face-to-face'

confrontation." Id. at 862 (Scalia, J., dissenting). "Whatever else [the Confrontation

Clause] may mean in addition, the defendant's constitutional right 'to be confronted with

the witnesses against him' means, always and everywhere, at least what it explicitly says:

the 'right to meet face to face all those who appear and give evidence at trial.'" Id.

(quoting Coy, 487 U.S. at 1016). Justice Scalia criticized the balancing test articulated by

the Craig majority, stating it runs afoul to the text of the Constitution. Id. at 870. "We

are not free to conduct a cost-benefit analysis of clear and explicit constitutional

guarantees, and then to adjust their meaning to comport with our findings." Id. "For

good or bad, the Sixth Amendment requires confrontation, and we are not at liberty to

ignore it." Id.

 Fourteen years later, Justice Scalia wrote for the majority in Crawford, and his

dissent from Craig became the Supreme Court's view of the Confrontation Clause

doctrine. The Supreme Court overruled Roberts because it is improper to "replac[e]

categorical constitutional guarantees with open-ending balancing tests." 541 U.S. at

 19
67-68. The Supreme Court held a defendant's confrontation right is absolute for

testimonial evidence unless the witness is unavailable and the defendant had "a prior

opportunity for cross-examination." Id. at 68. The Supreme Court discussed historical

examples to illustrate why face-to-face testimony is critical. Id. at 43-50; see also

Jemison, 952 N.W.2d at 399. For example, in Sir Walter Raleigh's 1603 trial for treason,

Raleigh argued his accuser lied in order to save himself and demanded the accuser testify:

"Call my accuser before my face." 541 U.S. at 44. The trial court refused Raleigh's

request, the jury found him guilty, and he was sentenced to death. Id. As a result,

"English law developed a right of confrontation that limited these abuses" against

criminal defendants. Id. The Supreme Court doubted a reliability balancing test would

have "provid[ed] any meaningful protection" in these cases. Id. at 68. Therefore, the

Supreme Court restored face-to-face testimony as a fundamental element of a defendant's

confrontation right. Id. at 57 (quoting Mattox v. United States, 156 U.S. 237 (1895)); see

also Mo. Const. art. I, § 18(a) ("[I]n criminal prosecutions the accused shall have the

right . . . to meet the witnesses against him face to face.").

 The Roberts reliability balancing test was the basis for Craig's rule to allow

important public policy considerations to override face-to-face confrontation only when it

is necessary and the testimony is reliable enough. 497 U.S. at 850. When Crawford

overruled Roberts, it put Craig's reliability-focused rule into serious doubt. 8 Whether

8
 Many courts have noted Crawford's potential effect on Craig's holding. See Jemison, 952
N.W.2d at 396. ("Crawford did not specifically overrule Craig, but it took out its legs."); Carter,
907 F.3d at 1206 n.3 ("The vitality of Craig itself is questionable in light of the Supreme Court's

 20
Craig continues to have any precedential value was well articulated by Judge Sutton in

his concurring opinion in United States v. Cox:

 Consider how they treated another decision of the Court: Ohio v.
 Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Craig relied
 heavily, indeed almost entirely, on Roberts to justify its decision. 497 U.S.
 at 846–50, 110 S.Ct. 3157. But Crawford overruled Roberts with respect to
 testimonial statements. 541 U.S. at 60–69, 124 S.Ct. 1354.
 Or consider how the two opinions characterized the Confrontation
 Clause guarantee. Craig treated the Clause as a safeguard for evidentiary
 reliability as measured by the judge in that case and today's rules of
 evidence. See 497 U.S. at 849, 110 S.Ct. 3157. But Crawford held that it
 was a procedural guarantee that "commands, not that evidence be reliable,
 but that reliability be assessed in a particular manner: by testing in the
 crucible of cross-examination" in front of the accused. 541 U.S. at 61, 124
 S.Ct. 1354.
 Or consider how the opinions treated a defendant's right to
 face-to-face confrontation with the witnesses against him. Craig said that
 the "face-to-face confrontation requirement is not absolute." 497 U.S. at
 850, 110 S.Ct. 3157. But Crawford said that a face-to-face meeting
 between an accuser and the accused was an essential part of the
 confrontation right. 541 U.S. at 43–45, 124 S.Ct. 1354. "Dispensing with
 confrontation because testimony is obviously reliable," Crawford observed,
 "is akin to dispensing with jury trial because a defendant is obviously
 guilty." Id. at 62, 124 S.Ct. 1354.
 Or consider the methodology of each opinion. Craig looked to the
 "growing body of academic literature documenting the psychological
 trauma suffered by child abuse victims who must testify in court" to
 identify new exceptions to the right to face-to-face confrontation. 497 U.S.
 at 855, 110 S.Ct. 3157. But Crawford looked to the original publicly
 understood meaning of confrontation to determine when the exception-free
 words of the guarantee ("[i]n all criminal prosecutions") should have
 exceptions. 541 U.S. at 42–50, 124 S.Ct. 1354.
 Or consider how each opinion describes the relationship of the
 Clause to the rules of evidence. Craig worried that adherence to the words
 of the guarantee was "too extreme" and would "abrogate virtually every
 hearsay exception" developed by the rules of evidence up to that point.
 497 U.S. at 848, 110 S.Ct. 3157 (quoting Roberts, 448 U.S. at 63, 100 S.Ct.
 2531). But Crawford refused to rely on "the law of evidence" at the time of

later decision in Crawford."); Thomas, 376 P.3d at 193 ("Crawford may call into question the
prior holding in Craig to the extent that Craig relied on the reliability of the video testimony.").

 21
 the trial because it "would render the Confrontation Clause powerless to
 prevent even the most flagrant inquisitorial practices." 541 U.S. at 51, 124
 S.Ct. 1354.
 Or consider each opinion's view of exceptions to the guarantee.
 Craig offered no hint that there was any limit to the kinds of exceptions that
 the Roberts balancing test would allow then or in the future.
 But Crawford carefully identified the kinds of exceptions that might be
 allowed under its approach and conspicuously never mentions Craig as one
 of them. See id. at 53–55, 124 S.Ct. 1354.

871 F.3d 479, 492-93 (6th Cir. 2017) (Sutton, J., concurring).

 Nevertheless, Crawford did not overrule Craig, and it is the Supreme Court's

"prerogative alone to overrule one of its precedents." State Oil Co. v. Khan, 522 U.S. 3,

20 (1997). Therefore, as this Court has contemporaneously held in State v. Smith, Slip

Op. at 18, Missouri courts should certainly continue to apply Craig to the facts it decided:

a child victim may testify against the accused by means of video (or similar Craig

process) when the circuit court determines, consistent with statutory authorization and

through case-specific showing of necessity, that a child victim needs special protection.

 Whether the combination of oath, cross-examination, and observation of

demeanor, when utilized in a two-way video setting in which the witness is in a remote

location with minimal or no safeguards, is ever enough to ensure reliability of any

witness does not have to be decided today because the circuit court made no

witness-specific findings regarding unavailability. More importantly, this Court is not

confident the issue would be decided the same way today. In denying certiorari in 2010,

Justice Sotomayor stated:

 This case presents the question whether petitioner's rights under the
 Confrontation Clause of the Sixth Amendment, as applied to the States
 through the Fourteenth Amendment, were violated when the State

 22
 introduced testimony at his trial via a two-way video that enabled the
 testifying witness to see and respond to those in the courtroom, and vice
 versa. The question is an important one, and it is not obviously answered
 by Maryland v. Craig. We recognized in that case that a defendant's right
 to confront accusatory witnesses may be satisfied absent a physical, face-to-
 face confrontation at trial, but only where denial of such confrontation is
 necessary to further an important public policy. In so holding, we
 emphasized that the requisite finding of necessity must of course be a case-
 specific one. Because the use of video testimony in this case arose in a
 strikingly different context than in Craig, it is not clear that the latter is
 controlling.

Wrotten v. New York, 130 S. Ct. 2520, 2520 (2010) (Sotomayor, J., denying certiorari)

(internal quotations, citations, and alterations omitted). To decide two-way video

procedures categorically satisfy the safeguards of the Confrontation Clause would be to

easily dispense with the "face-to-face confrontation requirement," something the

Supreme Court required in Crawford, 541 U.S. at 68, and even expressly cautioned

against in Craig, 497 U.S. at 850.

 Even if the analysis of the Craig case was applied to this juvenile adjudication

proceeding, the circuit court's judgment would be vacated. In this case, the circuit court

failed to make the requisite findings for the alleged victim or any of the other witnesses.

Prior to the hearing, the circuit court made reference to the existence of the COVID-19

pandemic, this Court's order regarding COVID-19 restrictions, and the Sixteenth Circuit's

order regarding COVID-19 restrictions. However, the circuit court's conclusion that this

Court's order granted permission to conduct C.A.R.A.'s adjudication hearing in a hybrid

format with the witnesses testifying remotely via two-way video was erroneous.

 This Court's COVID Operational Directives outlined phases of operation for

Missouri courts to follow to gradually resume in-person appearances and proceedings.

 23
In re: Operational Directives for Easing COVID-19 Restrictions on In-Person

Proceedings, supra note 2. Each phase authorized resuming certain in-person

proceedings and appearances, upon the order of the presiding judge or chief judge of the

applicable circuit, based on findings of specific "Gateway Criteria." Id. at A-B. The

"Gateway Criteria" outlined considerations "before resuming court activity or progressing

to a new Operating Phase." Id. at A. The Sixteenth Circuit entered its order in response

to this Court's order: "The Court will follow the Operational Directives and criteria set

forth by the Missouri Supreme Court." In Re: Updated Court Operations upon

Re-Opening of Courthouses Administrative Order 2020-084, supra note 3 at pg. 2.

 Throughout the pandemic, this Court's orders have excepted from in-person

proceedings that could be suspended "[p]roceedings necessary to protect the

constitutional rights of criminal defendants." In re: Operational Directives, supra

note 2 at C(2) (emphasis added). In all phases of operation, this Court's order contained a

"Gateway Criteria" providing: "Encourage judges and court staff to continue utilizing all

available technologies—including teleconferencing and video conferencing—whenever

possible to limit in-person courtroom appearances to the extent not prohibited by

constitutional or statutory provisions." Id. at C(4), D(5), E(5), F(5) (emphasis added)

(operating phase two and operating phase three contain slightly different language). The

Sixteenth Circuit's order similarly provided: "Whereas, the Missouri Supreme Court has

continued to encourage judges to utilize all available technologies—including

teleconferencing and video conferencing—to limit in person courtroom appearances

 24
to the extent not prohibited by the constitution or statutes as to the proceedings[.]"

In Re: Updated Court Operations, supra note 3 at pg. 2 (emphasis added).

 Operating phase zero of this Court's order, the most stringent phase of operation,

suspended all in-person proceedings, subject to exceptions, which included:

"Proceedings pursuant to chapters 210 and 211 pertaining to juvenile

delinquency[.]" In re: Operational Directives, supra note 2 at C(2) (emphasis added).

The Sixteenth Circuit's order also specifically addressed juvenile proceedings:

 The Court Administrator/Deputy Court Administrator may resume
 programming operated by the Family Court Services, provided however,
 that the resumption of said programming can proceed in compliance with
 the Operational Directives, social distancing requirements, limitations on
 size of gatherings, other terms of this Administrative Order and guidelines
 of the Centers for Disease Control and Prevention.

In Re: Updated Court Operations, supra note 3 at pg. 4 (emphasis in original).

 In addition to the circuit court's violation of C.A.R.A.'s constitutional right to

confrontation as discussed previously by permitting the two-way video testimony of

witnesses under the facts and circumstances of this case over objection, the circuit court

also failed to follow this Court's order, which was carefully drafted to ensure the

constitutional and statutory rights of juveniles were protected during the COVID-19

pandemic.

 S.V.'s Testimony

 S.V.'s testimony may have been the kind of testimony that could have been

presented via two-way video. Because the United States Supreme Court has not reversed

Craig, our circuit courts should apply our analysis in State v. Smith, Slip Op. at 18.

 25
A child victim may testify against the accused by means of video (or similar Craig

process) when the circuit court determines, consistent with statutory authorization and

through a case-specific showing of necessity, that the child victim needs special

protection.

 The relevant Missouri statutory authority that would have guided the circuit court's

findings to allow S.V. to testify via two-way video is § 491.699. 9 The circuit court had to

make findings, specific to S.V., regarding the elements of the offense charged and the

emotional and psychological trauma to S.V. if required to testify in open court or to be

brought into the personal presence of C.A.R.A.

 The circuit court in this case made no witness-specific findings as to S.V. In the

absence of such findings, S.V.'s testimony via two-way video was improper and a

violation of C.A.R.A.'s right to confrontation pursuant to Craig.

 Testimony of S.V.'s Mother and S.V.'s Babysitter Testimony

 The other witness testimony in the case at bar is also governed by our analysis in

State v. Smith, Slip Op. at 18. Under Crawford, witnesses may testify via two-way video

only when the circuit court determines the witness is unavailable and the defendant had a

9
 All statutory references are to RSMo 2016, unless otherwise indicated. The Missouri
legislature enacted § 491.699 to provide alternative procedures to live in-court testimony for a
child abuse victim in a juvenile proceeding. Upon motion by the juvenile officer, the circuit
court may order an in-camera videotaped recording of the alleged child victim. § 491.699.1.
The court is to consider "the elements of the offense charged and the emotional or psychological
trauma to the child if required to testify in open court or to be brought into the personal presence
of the alleged perpetrator." § 491.699.2. The in-camera recording can then be used as
substantive evidence and is "admissible in lieu of the child's personal appearance and testimony
at juvenile court hearings." § 491.699.1-.2. The section allows the court to preside over the
depositions, "conducted in accordance with the rules of evidence applicable to civil cases[,]" and
allows the attorney for the alleged perpetrator to have "at least two opportunities to cross-
examine the deposed alleged child victim." § 491.699.3-.4.

 26
prior chance to cross-examine the witness. Crawford, 541 U.S. at 68. In this case, the

circuit court made no finding as to the unavailability of any witness.

 It is unclear whether the COVID-19 pandemic generally could satisfy the

"important public policy" standard under Craig. Further, even if we assume the existence

of COVID-19 could satisfy the "important public policy" standard, the circuit court

would still be required to make witness-specific findings to determine it was necessary

for a particular witness to testify via two-way video due to an enhanced risk associated

with COVID-19. The existence of multiple viable alternatives in this case, including

issuing another continuance or reducing the number of people in the courtroom, suggests

even that finding may have been insufficient to support the necessity prong of Craig.

 None of the circuit court's general statements concerning COVID-19 satisfy the

requisite standard for either S.V.'s mother's testimony or S.V.'s babysitter's testimony. In

this case, no evidence whatsoever was presented to the circuit court concerning the

particular risks facing S.V., S.V.'s mother, or the other witnesses who testified on behalf

of the juvenile officer. And the circuit court made no finding that anything about the

health or circumstances of these witnesses required they be permitted to testify remotely.

 Further, any purported necessity of permitting the juvenile officer's witnesses to

testify remotely is undercut by the fact that the circuit judge, the judge's staff, C.A.R.A.,

and C.A.R.A.'s attorney were all physically present at the courtroom when the witnesses

testified. Presumably the circuit court found the safety measures in place in the

courtroom to be sufficiently protective to permit several individuals to be present.

 27
 Moreover, C.A.R.A.'s adjudication hearing was not subject to the suspension of

in-person proceedings covered by this Court's order.

 Conclusion

 This Court recognizes the devastating toll the COVID-19 pandemic has taken in

this country and our state and the substantial impact the pandemic has had on all aspects

of society. Nevertheless, generalized concerns about the virus may not override an

individual's constitutional right to confront adverse witnesses in a juvenile adjudication

proceeding.

 The circuit court erroneously declared and applied the law in admitting the

two-way video testimony in violation of C.A.R.A.'s right to confrontation. The circuit

court's judgment is vacated, and the case is remanded for further proceedings consistent

with this opinion. 10

 ___________________________
 Zel M. Fischer, Judge

All concur.

10
 Because this Court remands, it is not necessary to address C.A.R.A.'s remaining claims on
appeal.

 28
 SUPREME COURT OF MISSOURI
 en banc
 May 4, 2020
 Effective May 16, 2020

 OPERATIONAL DIRECTIVES
 As state and local governments begin lifting or relaxing stay-at-home orders and
restrictions on social distancing and group gatherings, the Supreme Court of Missouri
provides these Operational Directives to the courts of this state to follow before resuming
court activities that have previously been suspended by this Court’s prior orders. The
Court recognizes that conditions vary across the state; therefore, appropriate measures for
resuming activities must vary as well. Appropriate precautions and safeguards in large,
metropolitan areas may not be necessary or appropriate in less-populated communities.
Moreover, differences in docket sizes, courtroom and courthouse layouts, and the number
of judicial employees make it difficult to establish functional and effective statewide
orders. Accordingly, the purpose of these Operational Directives is to facilitate local
solutions appropriate to local conditions.
 Nevertheless, Missouri courts must maintain a certain degree of uniformity in our
response to the COVID-19 pandemic. Lawyers, litigants, victims, judicial employees,
witnesses, jurors, and the public need to know what to expect when they engage with the
Missouri judicial system regardless of where that engagement occurs. Accordingly, the
purpose of these Operational Directives also is to establish some uniformity in approach
among Missouri courts to the challenges created by the COVID-19 pandemic even
though the solutions to these challenges may vary from time to time and place to place.
 As courts plan and consider gradually resuming activities previously suspended as
conditions permit, the presiding judge or chief judge of the applicable circuit or court are
directed to adhere to the following Operational Directives. The citizens of the state and
employees who enter Missouri courthouses and court facilities must feel confident for
their own safety and understand that the health and welfare of every litigant, juror,
witness, victim, judicial employee, attorney, and other individual involved in judicial
proceedings across the state is paramount in the decisions that are made under these
Operational Directives.
 As set forth below, Missouri courts have been operating at what is referred to
herein as “Operating Phase Zero” since this Court’s March 16, 2020, order suspending
most in-person court proceedings. All courts will continue to operate under those
conditions until the presiding judge or chief judge of the applicable circuit or court
determines – in light of the Gateway Criteria described below – that improvements in
local conditions warrant moving to a higher Operating Phase or that deterioration in those
conditions necessitates moving to a lower Operating Phase. Each Operating Phase
reflects differing approaches to in-person proceedings, personnel and staffing, and
courthouse operations. How those approaches will vary depends on local conditions, the
needs and rights of the litigants and victims, the physical layouts of court facilities, and
the abilities of the judicial and non-judicial personnel. No court can transition beyond the
conditions set forth in Operating Phase Three until the Court’s order dated May 4, 2020,
is amended or rescinded.
 These Operational Directives are designed to assist courts in ensuring public
safety when making decisions at the local level. Accordingly, presiding judges and
chief judges should monitor local circumstances and conditions on a regular basis.
Any movement to the next higher Operating Phase under these Directives can be
made only after a court has been in the prior Operating Phase for a period of at
least 14 calendar days. A court may revert back immediately to a prior Operating
Phase when local conditions and circumstances require it. Courts must notify the
public of any transition to a new Operating Phase in its COVID-19 Notice and send
any order or notice to this Court to be included on the Missouri Courts’ website.
Prior to changing Operating Phases, the presiding judge or chief judge shall also
submit to the Clerk of this Court a notice in the form attached as exhibit A.
 The Court is closely monitoring policy changes recommended by state and local
government agencies and the Centers for Disease Control and Prevention (CDC) and will
update these Operational Directives as necessary.
 Directives
 A. Gateway Criteria
 Consider each of the criteria below before resuming court activity or progressing to a
 new Operating Phase:
 1. No confirmed COVID-19 cases in the court facility within a 14-day period.
 2. Rescission or lack of stay-at-home orders or the relaxing of group gathering
 restrictions applicable to the community.
 3. Improving COVID-19 health conditions over a 14-day period in the community,
 including conditions such as the number of confirmed COVID-19 cases and
 related deaths in relation to a community’s population density, size of particularly
 vulnerable populations, and availability of medical facilities including emergency
 and intensive care capacity.

 2
4. Consultation with local health officials or departments concerning changes to
 levels of court and courthouse activities.
5. Consultation with local judiciary partners such as children’s division personnel,
 juvenile officers, members of the local bar, prosecutors and public defenders, law
 enforcement and probation and parole.
If these Criteria suggest local conditions are improving sufficiently, a presiding judge
or chief judge may consider moving to a higher Operating Phase and gradually
resuming and adapting previously suspended court activities.
If these Gateway Criteria suggest local conditions are worsening or that there is a
resurgence of COVID-19 cases in the community, a presiding judge or chief judge
should move to a lower Operating Phase including, when necessary and appropriate,
returning to Operating Phase Zero.
B. Operating Phase Approach
1. Based upon the Criteria above, a presiding judge or chief judge may order a
 change of Operating Phase for each locality either up or down.
2. Any order or decision moving and adapting courthouse operations from one
 Operating Phase to another must implement appropriate policies protecting
 litigants, witnesses, victims, judicial employees, attorneys, and other individuals
 involved in judicial proceedings through:
 a. Social distancing and/or occupancy rate restrictions;
 b. A COVID-19 Notice prohibiting access to the premises for individuals who
 have been exposed to or are exhibiting symptoms of COVID-19, listing
 necessary contact information for individuals not authorized to enter the
 premises, and advising those entering a court facility of the social distancing,
 occupancy rate and other precautionary restrictions taken to protect the health,
 safety and welfare of occupants;
 c. The use of masks or face coverings by judicial employees or members of the
 public;
 d. Heightened sanitation and disinfection of common and high-traffic areas,
 including consideration of acquiring additional hand sanitizers and wipes, hand
 sanitizing stations, and cleaning solutions for court facilities;
 e. Coordination with supervisors to ensure employees feeling ill stay at home;
 f. Procedures liberally permitting judicial employees to work from home when
 appropriate; and
 g. Preparation for the potential resurgence of COVID-19 cases following the
 resumption of court activities.

 3
C. Operating Phase Zero
1. Consult with local judiciary partners and rely on local health officials or
 departments and CDC guidance to adapt court operating decisions to local health
 conditions.
2. Suspend all in-person court proceedings consistent with the Court’s April 17,
 2020, Order.
 The suspension of in-person proceedings is subject to the following exceptions:

 • Proceedings necessary to protect the constitutional rights of criminal
 defendants, including the right to a speedy trial, and the rights afforded
 under section 544.676.3;
 • Proceedings pursuant to chapters 210 and 211 pertaining to juvenile
 delinquency and abuse, neglect, and termination of parental rights;
 • Proceedings pursuant to chapter 453 pertaining to adoption;
 • Proceedings in which civil or criminal jury trials are already in progress as
 of March 16, 2020;
 • Proceedings pursuant to chapter 455 pertaining to orders of protection;
 • Proceedings related to emergency child custody orders;
 • Proceedings related to petitions for temporary restraining orders or other
 forms of temporary injunctive relief;
 • Proceedings related to emergency mental health orders;
 • Proceedings pursuant to Chapter 475 for emergency guardianship or
 conservatorship;
 • Proceedings directly related to the COVID-19 public health emergency;
 • Oral arguments regarding time-sensitive matters; and
 • Other exceptions approved by the Chief Justice of this Court.

 Courts may set in-person hearings in the above listed proceedings but it does not
 mandate a judge set a hearing in any individual case. The presiding judge of each
 circuit court and the chief judges of each appellate court are authorized to
 determine the manner in which the listed in-person exceptions are to be conducted.
 Such proceedings shall be limited to the attorneys, parties, witnesses, security
 officers, and other individuals necessary to the proceedings as determined by the
 judge presiding over the proceedings. The judge presiding over such proceedings
 has the discretion to excuse jurors or other individuals who cannot or should not
 appear as a result of risks associated with COVID-19.

3. All proceedings that do not require in-person appearances of parties or counsel are
 not suspended and may continue in the manner and at the discretion of the judge in
 the matter as circumstances allow.

 4
 4. Encourage judges and court staff to continue utilizing all available technologies –
 including teleconferencing and video conferencing – whenever possible to limit
 in-person courtroom appearances to the extent not prohibited by constitutional or
 statutory provisions.
 5. Implement appropriate levels of screening where possible at court facility
 entrances to mitigate against individuals experiencing symptoms related to
 COVID-19 from entering court facilities. Such screening may include
 temperature checks and screening questions.
 6. Suspend any non-essential travel by judicial employees for work-related functions.
 Continually reevaluate the Gateway Criteria for indications that a courthouse is ready
 to move to a different Operating Phase.
 D. Operating Phase One
 1. Continue to consult with local judiciary partners and rely on local health officials
 or departments and CDC guidance to adapt court operating decisions consistent to
 local health conditions.
 2. Reexamine and update local court orders and COVID-19 Notices as appropriate.
 3. Consider resuming only the most critical in-person proceedings and restrict grand
 and petit jury proceedings to only the most extraordinary, pressing, and urgent
 cases. (Operational Directives on conducting jury proceedings will be forthcoming
 from this Court as pandemic and health conditions improve.)
 4. Large venues and common areas such as break rooms should be closed. Keep
 occupancy rates in courtrooms, jury assembly rooms, and other areas in the court
 facility to an occupancy rate of 10 or less whenever possible and operate under
 strict social distancing protocols. Consider requiring the use of masks or face
 coverings. Require tape or other visible means be used to demark six-foot
 distances where practical. Allow vulnerable 1 litigants, witnesses, victims,
 attorneys, and other individuals involved in court proceedings to participate in the
 proceedings remotely or continue or postpone their required presence at the court
 facility.
 5. Encourage judges and court staff to continue utilizing all available technologies –
 including teleconferencing and video conferencing – whenever possible to limit
 in-person courtroom appearances to the extent not prohibited by constitutional or
 statutory provisions.

1
 Vulnerable individuals are defined by the CDC as individuals 65 years or older or
individuals with underlying medical conditions, particularly if not well controlled,
including those who suffer from chronic lung disease, moderate to severe asthma, serious
heart conditions, immune disorders, obesity, diabetes, or chronic kidney or liver disease.
 5
6. Suspend any non-essential travel by judicial employees for work-related functions.
7. Implement appropriate levels of screening where possible at court facility
 entrances to mitigate against individuals experiencing symptoms related to
 COVID-19 from entering court facilities. Such screening may include
 temperature checks and screening questions.
8. Increase cleaning and disinfection of common areas and consider providing hand
 sanitizers and wipes.
9. Vulnerable judicial employees should work with supervisors to stay at home.
 Employees who live with or provide care for vulnerable individuals should do the
 same to the greatest extent possible to reduce chances that they could carry the
 virus to those vulnerable individuals.
10. Judicial employees should observe at least a six-foot minimum physical distance
 from others in all offices, meetings, and court proceedings. Require tape or other
 visible means be used to demark six-foot distances where practical. Additional
 precautions such as requiring masks or face coverings should be considered.
11. Allow judicial employees to work in shifts whenever possible and feasible to keep
 staffing levels to a bare minimum to support court activity.
12. Allow judicial employees to stay home where possible if the employee:
 a) Is subject to a quarantine or isolation order or is living with or caring for such
 an individual;
 b) Has been advised by a health care provider to self-quarantine or is living with
 or caring for an individual who has been advised to self-quarantine;
 c) Is considered high risk based on local or state health officials or departments
 criteria for contracting COVID-19, or is living with or caring for such an
 individual;
 d) Is experiencing symptoms of COVID-19 and seeking medical diagnosis, or is
 living with or caring for such an individual; or
 e) Is caring for a child whose school or place of care has been closed or whose
 childcare provider is unavailable due to COVID-19 precautions.
 A court cannot proceed to Operating Phase Two until it has completed at least 14
 days in Operating Phase One. Before proceeding to Operating Phase Two, a court
 must reevaluate the Gateway Criteria to ensure readiness to progress to the next
 Operating Phase.

 6
E. Operating Phase Two
1. Continue to consult with local judiciary partners and rely on local health officials
 or departments and CDC guidance to adapt court operating decisions to local
 health conditions.
2. Reexamine and update local court orders and COVID-19 Notices as appropriate.
3. Increased in-person court proceedings, including the most extraordinary, pressing,
 and urgent grand and petit jury proceedings, can begin where they can safely be
 conducted in compliance with social distancing protocols and occupancy rate
 limitations applicable to the local community. (Operational Directives on
 conducting jury proceedings will be forthcoming from this Court as pandemic and
 health conditions improve.)
4. Keep occupancy rates in large venues and common areas such as courtrooms, jury
 assembly rooms, jury deliberating rooms, break rooms, and other areas in court
 facilities to an occupancy rate of 25 or less whenever possible and operate under
 social distancing protocols. Consider requiring the use of masks or face coverings.
 Require tape or other visible means be used to demark six-foot distances where
 practical. Continue to allow vulnerable litigants, witnesses, victims, attorneys, and
 other individuals involved in court proceedings to participate in the proceedings
 remotely or postpone their required presence at the court facility.
5. Continue to encourage judges and court staff to utilize all available technologies –
 including teleconferencing and video conferencing – whenever possible to limit
 in-person courtroom appearances to the extent practicable and not prohibited by
 constitutional or statutory provisions.
6. Continue to suspend any non-essential travel by judicial employees for work-
 related functions.
7. Continue to implement appropriate levels of screening at court facility entrances to
 mitigate against individuals experiencing symptoms related to COVID-19 from
 entering court facilities. Such screening may include temperature checks and
 screening questions.
8. Continue increased cleaning and disinfection of common areas and consider
 providing hand sanitizers and wipes.
9. Continue to allow vulnerable judicial employees to work with supervisors to
 establish reasonable accommodations for those vulnerabilities.
10. Judicial employees, when in the court facility, should continue to maximize
 physical distance from others. Six foot distancing should continue to be observed
 in all offices, meetings, and court proceedings. Require tape or other visible
 means be used to demark six-foot distances where practical. Additional
 precautions such as requiring masks or face coverings should be considered.

 7
11. Continue to allow judicial employees to work in shifts whenever possible and
 feasible to keep staffing levels to a bare minimum to support increased court
 activity.
12. Allow judicial employees to stay home if the employee:
 a) Is subject to a quarantine or isolation order or is living with or caring for such
 an individual;
 b) Has been advised by a health care provider to self-quarantine or is living with
 or caring for an individual who has been advised to self-quarantine;
 c) Is considered high risk based on local or state health official or department
 criteria for contracting COVID-19, or is living with or caring for such an
 individual; or
 d) Is experiencing symptoms of COVID-19 and seeking medical diagnosis, or is
 living with or caring for such an individual.
 A court cannot proceed to Operating Phase Three until it has completed at least 14
 days in Operating Phase Two. Before proceeding to Operating Phase Three, a court
 must reevaluate the Gateway Criteria to ensure readiness to progress to the next
 Operating Phase.
F. Operating Phase Three
1. Continue to consult with local judiciary partners and rely on local health officials
 or departments and CDC guidance to adapt court operating decisions to local
 health conditions.
2. Reexamine and update local court orders and COVID-19 Notices as appropriate.
3. Resume in-person court proceedings, including grand and petit jury proceedings,
 that can be conducted in compliance with social distancing protocols and
 occupancy rate limitations applicable to the local community. (Operational
 Directives on conducting jury proceedings will be forthcoming from this Court as
 pandemic and health conditions improve.)
4. Large venues and common areas such as courtrooms, jury assembly rooms, jury
 deliberating rooms, break rooms, and other areas in the court facility can operate
 under social distancing protocols. Consider requiring the use of masks or face
 coverings. Consider continuing to allow vulnerable litigants, witnesses, victims,
 attorneys, and other individuals involved in court proceedings to participate in the
 proceedings remotely or continue or postpone their required presence at the court
 facility.

 8
5. Continue to encourage judges and court staff to utilize all available technologies –
 including teleconferencing and video conferencing – whenever possible to limit
 in-person courtroom appearances to the extent not prohibited by constitutional or
 statutory provisions.
6. Consider terminating enhanced screening procedures at court facility entrances.
7. Continue cleaning and disinfection of common areas and consider providing hand
 sanitizers and wipes.
8. Allow vulnerable judicial employees to return to work but encourage supervisors
 to make reasonable accommodations to address those vulnerabilities.
9. Judicial employees should continue to adhere to social distancing guidelines in
 court facilities. Additional precautions such as requiring masks or face coverings
 should be considered.
10. Consider resuming normal staffing schedules for judicial employees.
11. Consider discontinuing the suspension of non-essential travel by judicial
 employees for work-related functions.
12. Allow judicial employees to stay home if the employee:
 a) Is subject to a quarantine or isolation order or is living with or caring for such
 an individual;
 b) Has been advised by a health care provider to self-quarantine or is living with
 or caring for an individual who has been advised to self-quarantine;
 c) Is experiencing symptoms of COVID-19 and seeking medical diagnosis, or is
 living with or caring for such an individual.

 9
 EXHIBIT A

 Notice to the Supreme Court of Missouri of Higher/Lower Operating Phase

 I, _______________________, (presiding judge or chief judge) of

___________________________ notify the Supreme Court of Missouri that the following will

move to Operating Phase _______on the ___ day of ___________, 2020.

Mark all that apply:

__ Entire Judicial Circuit/Appellate District; or

__ County/Counties of ____________________________________________ within the Circuit;

and/or

__ Municipal Division(s) of ________________________________________within the Circuit.

Dated: _________________ __________________________________
 (Presiding Judge or Chief Judge)
 IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
 16TH JUDICIAL CIRCUIT, STATE OF MISSOURI

In Re: Updated Court Operations upon Re-Opening of Courthouses

 
 ADMINISTRATIVE ORDER 2020-___

 WHEREAS, the Centers for Disease Control and Prevention have declared that
the spread of COVID-19 has become a worldwide pandemic; and

 WHEREAS, the State of Missouri, Jackson County and various Mayors of cities in
Jackson County have previously entered stay at home Orders and other emergency
Orders requiring residents to remain at home except for activities essential to health and
safety, and requiring businesses to cease operations unless they are considered essential
businesses; and

 WHEREAS, the continuing operation of the 16th Judicial Circuit Court (“Court”)
has been deemed to be an essential governmental service and therefore, the Court has
remained open and operational during the term of all Stay-At-Home Orders, performing
core judicial functions, often through remote technologies including video and telephone
hearings and conferences; and

 WHEREAS, the previously entered stay at home Orders and emergency Orders
have been lifted or terminated and/or have been replaced with Orders allowing for the
phased and gradual re-opening of society, businesses, communities and the courthouses
in which the Court operates, while also including restrictions to minimize the potential
spread of COVID-19; and

 WHEREAS, the Missouri Supreme Court has issued several Orders regarding
court operations, the most recent of which includes Operational Directives related not
only to considering strategies to prevent the spread of COVID-19, but also directives
which provide for a phased approach toward easing restrictions related to court
operations, with a clear intent to move toward more complete court operations; and

 WHEREAS, notwithstanding the Court commencing a slow, deliberate plan moving
toward more complete court operations pursuant to Missouri Supreme Court Orders, the
Court’s operations will continue to be significantly modified; and

 WHEREAS, circumstances regarding COVID-19 have changed dramatically since
the Court’s issuance of prior Administrative Orders related to court operations; and

 1
 WHEREAS, it has been and continues to be imperative that the Court take steps
to protect the health and safety of employees of the Court, all judicial officers, all
attorneys, all litigants, all victims, all witnesses, any other individuals or entities who
have cases and hearings before the Court and all members of the general public who
interact with or have business with the Court; and

 WHEREAS, the Missouri Supreme Court has continued to authorize the
Presiding Judge of each Circuit to facilitate local solutions regarding the continuation
and/or restoration of court operations, while also considering and maintaining a
certain degree of uniformity; and

 WHEREAS, the Missouri Supreme Court has continued to encourage judges to
utilize all available technologies – including teleconferencing and video conferencing –
to limit in person courtroom appearances to the extent not prohibited by the constitution
or statutes as to the proceedings; and

 WHEREAS, the Missouri Supreme Court’s Operational Directives describe
criteria to be evaluated and considered regarding the continued operation of the Court
as well as the progression or regression to different Phases set forth in the Operating
Directives; and

 WHEREAS, the 16th Judicial Circuit Court operates in numerous buildings and
courthouses, including the Kansas City Courthouse, the Eastern Jackson County
Courthouse, the Family Court Divisions at the Family Justice Center, the Albert Riederer
Community Justice Complex and the Community Justice Building (herein collectively
referred to as the “Court Buildings”); and

 WHEREAS, pursuant to Section 478.240.2 R.S.Mo. and Section 15 of the Missouri
Constitution, the Presiding Judge has general administrative authority over all judicial
personnel and court officials in the Circuit as well as administrative authority over
dockets of the Court and the administrative and discretionary authority regarding the
manner in which any hearings are conducted in the Court.

 IT IS HEREBY ORDERED, effective immediately and continuing until rescinded,
amended, modified or extended in a subsequent Administrative Order, as follows:

 1. The Court will follow the Operational Directives and criteria set forth by
the Missouri Supreme Court as it works toward restoration of court operations, including
the utilization of local solutions appropriate to local conditions.

 2. The Court will submit to the Missouri Supreme Court in a regular and
timely manner, “Exhibit A, Notice to the Supreme Court of Missouri of Higher/Lower
Operating Phase” as set forth in and referenced in the Supreme Court’s Order dated May

 2
4, 2020, effective May 16, 2020. The Court will follow the applicable guidelines and
directives for the Phase specified in its submitted Exhibit A, supplemented by the specific
terms of this Administrative Order and any amendments hereto. To the extent this
Administrative Order provides local solutions or additional terms unique to the local
conditions presented to the Court, those solutions and terms shall continue to apply until
rescinded or modified by a subsequent Administrative Order.

 3. The Court shall continue to utilize all available technologies, including
teleconferencing and video conferencing, to the greatest possible extent for all
proceedings, hearings and/or conferences (collectively referred hereinafter as
“proceedings”) so as to not require the physical presence of persons in Court Buildings.
The Court will limit in person proceedings as much as possible.

 4. Subject to the provisions of paragraph 3 above, in person proceedings may
resume but only in very limited and extreme circumstances for critical proceedings in
extraordinary and urgent situations, based on a determination that alternative methods
for conducting said proceedings cannot occur, including a determination by the Judicial
Officer presiding over any such proceedings that it is not possible for such proceedings
to be conducted by telephone, teleconference, polycom, videoconferencing, or any other
method that does not require the physical presence of persons in Court Buildings. In
person hearings should be conducted only as a last resort when all other alternative methods
to proceed have failed.

 5. The Court Administrator has previously established procedures for pro se
litigants to deliver and/or file pleadings and other documents with the Court via fax
filing, email filing, and by creating drop boxes at designated entries to Court Buildings.
Those procedures are posted on Court Building doors, posted on the Court’s website at
www.16thcircuit.org, and posted on the Court’s Facebook page. Those procedures shall
remain in place as alternatives to pro se litigants filing said documents personally at the
courthouses.

 6. In all criminal cases where the defendant is in detention at the Jackson
County Detention Center or otherwise in custody at any other detention center or at any
other prison, said defendant shall not be personally transported to or brought into Court
Buildings for any hearing or conference. All hearings and conferences regarding any
such defendant shall be conducted via teleconference or videoconference, including
initial appearance and arraignment hearings.

 7. Each Judicial Officer and his/her division staff shall be responsible for
notifying all parties and counsel if his/her cases/dockets are being conducted by
teleconference, videoconference or the manner in which hearings will be held. Each
Judicial Officer and his/her division staff shall also be responsible for re-scheduling new

 3
hearing dates and notifying all parties and counsel of new hearing dates in the event cases
cannot be heard as scheduled.

 8. The Court may resume scheduling in person hearings on full orders of
protection, subject to social distancing requirements, limitations on the size of gatherings
as set forth in the applicable Operational Directives and other limitations set forth in this
Administrative Order. The in person hearings on full orders of protection that have
previously been continued by prior Administrative Orders will be re-scheduled by the
Court and if possible, given priority regarding hearing dates. Given the previous
suspension of said hearings, all Ex Parte Orders of Protection currently in existence will
be extended by operation of this Administrative Order until the full order of protection
hearing can be scheduled and actually occurs. In addition, because of the backlog of
Order of Protection cases, all Ex Parte Orders of Protection entered subsequent to this
Administrative Order which are not able to be heard within 14 days of the entry of the
Ex Parte Order, will be extended by operation of this Administrative Order until a full
order of protection hearing can be scheduled and actually occurs. Nothing in this
Administrative Order bars or prevents holding hearings on full orders of protection via
teleconference or videoconference. Therefore, if all parties in a particular case are
available to allow said hearing to be conducted via teleconference or videoconference,
said hearing shall proceed in that manner.

 9. When a defendant in a pending criminal case bonds out of the Jackson
County Detention Center, he/she is given a date for his/her initial appearance. Any such
date provided to a defendant shall be continued and the initial appearance will be held
90 days after the date provided at the time the defendant bonds out of the detention
center.

 10. While this Administrative Order remains in effect, judges presiding over a
civil or domestic case or matter may exercise their discretion to waive, for good cause
shown, any filing deadlines or time limitations set through Missouri’s e-filing system or
by court order, local rule, or Missouri Supreme Court Rules 41 through 81. This
authorization does not apply to any deadline or time limitations set by statute or
constitutional provision.

 11. The Court Administrator/Deputy Court Administrator may resume
programming operated by the Family Court Services, provided however, that the
resumption of said programming can proceed in compliance with the Operational
Directives, social distancing requirements, limitations on sizes of gatherings, other terms
of this Administrative Order and guidelines of the Centers for Disease Control and
Prevention.

 4
 12. All municipal courts in Jackson County, Missouri are subject to this
Administrative Order and are encouraged to take appropriate action consistent with this
Administrative Order and Centers for Disease Control and Prevention guidelines.

 13. The provision of Circuit Court Local Rule 68.3.1 which requires that each
party be represented by separate counsel, shall remain temporarily suspended.
Therefore, assuming all other requirements of Local Rule 68 are complied with, proposed
Judgments may be submitted by Joint signed Affidavit and entered by the Court when
only one party is represented by counsel instead of the requirement that both parties be
represented by counsel. All other terms of Local Rule 68 remain in effect.

 14. All nonessential court related travel for staff and judicial officers shall remain
suspended.

 15. All Court staff and all members of the public who appear at any Court
Building for hearings and/or to conduct any court-related business, shall comply with
all screening requirements and/or other requirements to mitigate against the spread of
COVID-19 which are imposed at all Court Buildings, including but not limited to
temperature checks and medical screenings in order to enter any Court Building, wearing
masks or other face coverings as a condition to enter any Court Building, wearing masks
or other face coverings in all public areas in all Court Buildings and social distancing.

 IT IS FURTHER ORDERED that to the extent the directives and declarations set
forth in this Administrative Order differ with the Court’s prior Administrative Orders,
this Administrative Order controls.

THIS ORDER MAY BE AMENDED, RESCINDED, MODIFIED OR EXTENTED AS
CIRCUMSTANCES REQUIRE.

IT IS SO ORDERED.

May 14, 2020 __________________________________
 ___________________________
Date David M. Byrn,
 yrn, Presiding
 Pr iding Judge

Certificate of Service

This is to certify that a copy of the foregoing was emailed to the following on May 14,
2020.

16th Circuit Court Judiciary and Staff
Frank White, County Executive

 5
Troy Schulte, County Administrator
Darryl Forte, Sheriff
Theresa Galvin, Legislative Chair
Members of the Legislature
Mary A. Marquez, Court Administrator
Jean Peters-Baker, Prosecutor
Ruth Petsch, District Defender

 6